T.C. Memo. 2010-104

UNITED STATES TAX COURT

ANDREW K. LUDWICK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WORTH Z. LUDWICK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3281-08, 3282-08.      Filed May 10, 2010.

Paul H. Roskoph, for petitioners.

Andrew R. Moore, for respondent.

MEMORANDUM OPINION

HALPERN, Judge:  Respondent determined deficiencies in
Federal gift tax for 2005 for Andrew K. Ludwick and Worth Z.
Ludwick of $86,529 and $88,785, respectively.  Petitioners owned
a vacation home as tenants in common, and the only issue for

decision is the value of the interests therein that they separately transferred in trust to a so-called qualified personal residence trust.

Unless otherwise stated, all section references are to the Internal Revenue Code in effect for 2005, and all Rule references are to the Tax Court Rules of Practice and Procedure.

We round all dollar amounts to the nearest dollar.

## Background

Some facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

Petitioners are husband and wife, and they resided in California when they filed the petition.

In 2000, petitioners purchased unimproved real property on a bluff on the north shore of Hawaii's Big Island. By the end of 2003, they had improved the property by constructing a vacation home. In 2004, they owned the improved property (the property) as tenants in common, each having an undivided one-half interest therein.

In December 2004, petitioners executed agreements establishing separate qualified personal residence trust arrangements. In February 2005, petitioners transferred their undivided interests in the property pursuant to those trust agreements. At the time of the transfers, the property had a

fair market value of $7.25 million and an annual operating cost of approximately $350,000.

On their separate 2005 Federal gift tax returns, petitioners each reported a gift resulting from the transfers in trust. They valued their separate one-half interests in the transferred property at a discount of 30 percent; viz, $2,537,500 (0.70 x 0.50 x $7,250,000). In determining the deficiencies in gift tax, respondent allowed a discount of only 15 percent, so that he computed $3,081,250 to be the value of each undivided one-half interest that petitioners transferred. On brief, respondent argues for a discount of no more than 11 percent, which results in a value for each transfer of $3,226,250.

## Discussion

### I. Introduction

As stated, we must determine the fair market value of each petitioner's undivided one-half interest in the property.

The standard for determining fair market value for purposes of the gift tax is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having knowledge of the relevant facts. Sec. 25.2512-1, Gift Tax Regs. Petitioners bear the burden of proof and do not argue otherwise.

See Rule 142(a).[1]  We find that, at the time of the transfer, the fair market value of each undivided one-half interest in the property was $3,000,089, for a discount of approximately 17 percent.  We will explain the process by which we reach that result.

II.  Valuation of the Gifts

To support their respective valuations, the parties have in part relied on the testimony of experts.  We have considered that testimony and have in part relied on it in reaching our conclusion.

A.  Method of Valuation

1.  The Expert Reports

Petitioners request that we value each undivided interest by discounting half the fair market value of the property ($3,625,000) by 30 percent to reflect the disadvantages of owning an undivided fractional interest in property.  Respondent requests a broadly similar approach, although he reaches a different conclusion regarding the size of the proper discount.

Petitioners' expert, Carsten Hoffman, an expert in the valuation of fractional interests in property, relied on analyses of sales of undivided interests and partnership interests.

---

[1]Petitioners have not raised the issue of sec. 7491(a), which shifts the burden of proof to the Commissioner in certain situations.  We conclude that sec. 7491(a) does not apply here because petitioners have not produced any evidence that they have satisfied the preconditions for its application.

Respondent's expert, Stephen Bethel, also an expert in the valuation of fractional interests in property, relied on analyses of sales of undivided interests, various surveys of brokers, a review of tender offers for majority interests in public companies, and lawyers' estimations of the cost of partition. We do not find the analysis of either expert convincing.

Mr. Hoffman, in his direct testimony, compared the discounts from 69 "undivided interest transactions" between 1961 and 2006. He calculated the mean and median discounts for the set of all the transactions and for three subsets: 16 income-producing properties, 26 parcels of raw land, and 22 transactions involving undivided 50-percent interests. He also provided the range of discounts for all the transactions and for each of those three subsets. He provided no way for us to evaluate his analysis, however. He failed not only to explain how the discounts were calculated (i.e., how did he calculate the underlying fair market value?) but also to provide any measure of the variability or dispersion of his data points (e.g., their standard deviations). Most importantly, he did not provide any of the data; we do not know the specifics of any of the "undivided interest transactions". We have no way to know how comparable those properties were to the one here in issue.

Mr. Hoffman also compared petitioners' property to 10 real property limited partnerships. Yet petitioners' property was

never intended to produce income; it was a private vacation home, not a source of revenue. The cashflow statements of the 10 limited partnerships (which held, for instance, apartment buildings and mobile homes) are not relevant.

Mr. Bethel, in his direct testimony, in part relied on four sales of undivided interests between 2002 and 2007. Yet all the sales involved commercial property in the eastern United States. We are not convinced that such data tells us much about the appropriate discount for a multimillion dollar vacation home in Hawaii.

Mr. Bethel also relied on three surveys of California brokers that his firm conducted in 1999, 2005, and 2008. The survey questions involved the discounts associated with fractional interests in property. About 10 brokers responded to each survey by providing a range of discounts and a brief explanation.[2] Yet we have no way of evaluating or of reconciling the brokers' responses because we have no information about the transactions on which the brokers based their opinions. Moreover, the brief explanations are often so cryptic as to

---

[2]We ignore some responses. For example, one broker opined that the discount associated with the sale of a fractional interest would be 15 percent (he did not give a range), yet the comment beside his estimate stated: "He has never sold a minority position in a tenancy in common, but in his opinion there must be a discount for the position."

reveal almost nothing about the reasons behind the discount ranges.  The surveys provide little guidance.

Mr. Bethel also relied on two surveys with brokers regarding so-called pooled public tenancy-in-common investments, which are professionally managed investment properties with multiple owners.  Fractional interests in those investments generally trade with almost no discount.  In his report, Mr. Bethel conceded that there are "four critical differences" between those investments and petitioners' property,[3] yet he argued that those differences would only "slightly" increase the discount proper here.  Mr. Bethel did not explain his conclusion, and, without any reasoning, we are not convinced.

Finally, Mr. Bethel relied on a professional review of tender offers for majority interests in public companies.  Specifically, he relied on transactions involving the change of control of real estate companies.  He calculated the discounts as follows:  If the market price were $100 and a buyer tendered $125, then the premium would be 25 percent and the discount would be 20 percent.  As Mr. Bethel noted, however, the size of a control premium depends on many factors (e.g., "the buyer's desire or need to acquire the company * * * to complement his

---

[3]Pooled public tenancy-in-common investments are professionally managed, and interests therein are readily marketable, represent ownership in a diverse set of properties, and have relatively steady income streams.

present operation") that do not seem relevant to the discount appropriate here. We find the tender offer analysis unhelpful.

2. <u>Partition</u>

At trial, we asked both experts why a buyer of an undivided interest in the property would consider the interest worth any less than a proportional share of the fair market value of the whole property reduced by the cost to the buyer of partition; i.e., the cost to end joint ownership involuntarily by a judicially mandated sale (as a single residential property, the property was unlikely to be divided into separate estates) and to distribute the proceeds appropriately. Both convinced us that a buyer would also take into account marketability or liquidity risk; i.e., "the risk of being unable to sell an asset quickly at its fair market value." Downes & Goodman, Dictionary of Finance and Investment Terms 391 (7th ed. 2006). They disagreed, however, as to the size of the appropriate discount and as to whether partition would even be necessary.

Although Mr. Hoffman insisted that a buyer would consider more than just the cost of partition and the marketability risk, he failed to convince us. Certainly a tenancy in common is not the ideal way for two strangers to own a vacation home. That does not mean, however, that a buyer would discount an undivided interest by any more than the cost of liquidating his investment

and an additional amount to reflect the risk occasioned by a less than immediate sale. Indeed, Mr. Hoffman testified:

> And if you have the right to * * * force a partition, you will certainly consider that. And if an investor were to come to me and say, well, I demand an 80 percent discount because it's an undivided interest, I would say, well, that doesn't make sense because you can partition it for significantly less than that, so why would you demand an 80 percent discount.

The logic of that statement is that a buyer who had a right to partition could not demand a discount greater than (1) the discount reflecting the cost and likelihood of partition and (2) the discount representing the marketability risk because, if he did, another (rational) buyer would be willing to bid more. That iterative process would drive the discount down to the discount reflecting the expected cost of partition and the marketability risk. Mr. Hoffman failed to convince us otherwise.

Petitioners concede that Hawaii law provides for partition of real property. See Haw. Rev. Stat. Ann. sec. 668-1 (Lexis Nexis 2007). A buyer would thus be willing to pay an amount equal to the present value of (1) the fair market value of 50 percent of the property upon sale less (2) his costs of maintaining the property and his costs of selling the property (perhaps including the cost of partition). Accordingly, to determine the price that a buyer would be willing to pay, we must figure (1) the length of the partition process, its costs (including the cost of selling the property), and the likelihood

partition would be necessary, (2) the rate of return the buyer would demand, and (3) the value of 50 percent of the property upon sale.  See Estate of Barge v. Commissioner, T.C. Memo. 1997-188.

B.  What a Buyer Would Pay

1.  Partition

In partition suits, Hawaii courts may sell real property where partition in kind would be impracticable or greatly prejudicial to the interested parties.  See Haw. Rev. Stat. Ann. sec. 668-7(6) (Lexis Nexis 2007).  Petitioners do not dispute that partition would result in a sale of the property.  Mr. Hoffman testified that a contested partition would take 2 to 3 years to resolve and that its costs would include $10,000 of appraisal costs and $70,000 of litigation expenses.  Mr. Bethel testified that a contested partition could take up to 2 years to resolve, and he estimated that its costs would include $15,000 to $20,000 "to proceed with filings", a brokerage fee of 4 to 6 percent, and a closing fee of 1 percent.  Mr. Bethel concluded that the total cost of partition would range from 6 to 8 percent of the value of the property.  Mr. Bethel testified that, if partition were not necessary, the property could be sold in less than a year.

We find that a contested partition would take 2 years to resolve (including 1 year to sell the property) and that the

costs made necessary by the litigation would be 1 percent of the value of the property (that is, $72,500).  Petitioners, however, have failed to convince us that partition will always--indeed, will often--be necessary.  In fact, when respondent's counsel suggested that partition was "relatively unlikely", Mr. Hoffman seemed to agree.[4]  Nonetheless, neither party suggested the likelihood of partition.  Bearing heavily on petitioners, who bear the burden of proof, we find that a buyer would expect partition to be necessary 10 percent of the time.  We find that the cost of selling the property (which the sellers would bear in any case) would be 6 percent of the value of the property (that is, $435,000).  Finally, the annual operating cost of the property was approximately $350,000.  We assume that a buyer of a one-half undivided interest in the property would expect to bear only half the costs described above; the buyer would expect the remaining petitioner to bear the other half.

---

[4]Respondent's argument is as follows.  Suppose petitioner husband had sold his interest.  If the buyer then told petitioner wife that he wanted to sell the property, what are the odds that she would object?  Not only would he have a right to partition but also a court would ultimately order the property sold (as opposed to divided).  Petitioners have failed to explain what (in that hypothetical) petitioner wife would stand to gain by opposing partition.  Cf. Estate of Barge v. Commissioner, T.C. Memo. 1997-188 (finding that, in a case in which the property would have been divided (not sold), the other owners might resist partition "to obtain an advantageous partition").  Respondent, however, concedes that such opposition is possible, and we accept that concession.

2. Rate of Return

Mr. Bethel testified that, to account for the marketability risk, a buyer would demand a return of 10 percent.  Mr. Hoffman testified that a buyer would demand a return of 30 percent.  Nonetheless, he presented no evidence to support that conclusion.  Petitioners have failed to prove that a buyer would demand a return greater than 10 percent.

3. Value of Interest After Partition

The parties stipulated that in 2005 the property had a fair market value of $7.25 million.  Mr. Hoffman testified that the "long-term sustainable growth [rate] of real estate" was 3 percent annually.  Accordingly, at the end of 1 year (if partition were not necessary) or 2 years (if it were) the property would sell for $7,467,500 or $7,691,525, respectively.

III. Fair Market Value

Accordingly, to determine the value of an undivided one-half interest in the property, we use a 10-percent rate of return (discount rate), a partition period of 2 years (including a selling period of 1 year), annual operating costs of $175,000, (possible) partition costs of $36,250 allocated equally to both years, the cost of selling the property ($217,500), and a fair market value of $3,733,750 or $3,845,763 (after a sale in 1 year or 2 years, respectively).  We find that the fair market value of

the gift that each petitioner made in 2005 was $3,000,089; our calculations are as follows.

### If Partition Is Not Necessary

| Year | Operating Costs | Selling Costs | Sale Proceeds | Total | Present Value |
|------|-----------------|---------------|---------------|-------|---------------|
| 1 | $175,000 | $217,500 | $3,733,750 | $3,341,250 | $3,037,500 |

### If Partition Is Necessary

| Year | Operating Costs | Partition and Selling Costs | Sale Proceeds | Total | Present Value |
|------|-----------------|------------------------------|---------------|-------|---------------|
| 1 | $175,000 | $18,125 | -- | ($193,125) | ($175,568) |
| 2 | 175,000 | 235,625 | $3,845,763 | 3,435,138 | 2,838,957 |
| Total | | | | | 2,663,388 |

We have found that a buyer would expect partition to be necessary 10 percent of the time.  Thus, the buyer of an undivided one-half interest in the property would have been willing to pay the weighted average of the two present values calculated above; that is, $3,000,089.

Decisions will be entered

under Rule 155.