T.C. Memo. 2013-51

UNITED STATES TAX COURT

JOHN CRIMI, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13252-09, 13262-09,    Filed February 14, 2013.
20519-09, 22374-09,
22417-09, 22531-09.

Frank Agostino, Soh-Yung E. Son, Lawrence M. Brody, and Jeremy M.

Klausner, for petitioners

Sze Wan Florence Char, Lydia A. Branche, and Jamie J. Song, for

respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Susan Crimi, docket No. 13262-09; John C. Crimi, docket No. 20519-09; Edward Mintel and Angela Mintel, docket Nos. 22374-09 and 22417-09; and John J. Crimi and Charla Crimi, docket No. 22531-09.  Petitioners John Crimi, in docket No. 13252-09, and John C. Crimi, in docket No. 20519-09, are the same individual.

**[*2]**         MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  In July 2004 petitioners transferred to Morris county, New Jersey (county), more than 65 acres of undeveloped land for $1,550,000 in what they maintain was a part-sale, part-gift transaction.  Petitioners reported the value of the land for Federal income tax purposes as $2,950,000 and they claimed, as the case was for each claiming petitioner or couple, charitable contribution and related carryover deductions for 2004 and 2005.  In separate notices of deficiency issued to each petitioner or couple, respondent determined deficiencies and disallowed the deductions in full on the grounds that petitioners did not meet the requirements of section 170.[2]  Petitioners petitioned the Court to redetermine the deficiencies under section 6213, and we consolidated these cases pursuant to Rule 141. Following concessions,[3] we decide two issues.  First, we decide whether the fair

---

[2]All section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]The parties have stipulated petitioner Susan Crimi in docket No. 13262-09 is entitled to full relief from joint and several liability for 2004 under sec. 6015(c). The parties agreed petitioners received the following ordinary income in 2004 and 2005 from his, her, or their interests in county Concrete Corp. (Concrete), an S corporation of which they are shareholders:

(continued...)

[*3] market value of the subject property on the contribution date exceeded the consideration received from the county. We hold it did to the extent stated herein. Second, we decide whether petitioners' charitable contribution and excess carryover deductions are disallowed on account of lack of substantiation. We hold they are not.

## FINDINGS OF FACT

I.    Preliminaries

Some facts were stipulated. We incorporate by this reference the stipulation of facts and the accompanying exhibits. Each petitioner or couple resided in New Jersey when he, she, or they petitioned the Court.

II.    Petitioners

Petitioners in these cases are John C. Crimi (petitioner) and Susan Crimi (Ms. Crimi) (collectively, Crimis), who were married in June 1973 and divorced in

---

3(...continued)

| Petitioner(s) | Docket No. | 2004 | 2005 |
|---|---|---|---|
| John Crimi | 13252-09 | $156,086 | N/A |
| John C. Crimi | 20519-09 | N/A | $100,604 |
| Edward and Angela Mintel | 22374-09 | 7,319 | N/A |
| Edward and Angela Mintel | 22417-09 | N/A | 4,717 |
| John J. Crimi and Charla Crimi | 22531-09 | 7,320 | N/A |

**[*4]** March 2005, as well as John J. Crimi (John) and Angela Crimi Mintel, who are the Crimis' children, and their respective spouses.

III.   Concrete

At all relevant times, petitioner was the president and majority shareholder of Concrete, an S corporation with a fiscal year ended September 30.  The shareholders of Concrete (and their percentage of ownership) were petitioner (approximately 88% shareholder), the John J. Crimi Irrevocable Ten Year Managed Trust (John's trust) (approximately 4% shareholder), the Anthony J. Crimi Ten Tear Managed Trust (Anthony's trust) (approximately 4% shareholder), and the Angela M. Crimi Irrevocable Ten Year Managed Trust (Angela's trust) (approximately 4% shareholder).  John is the beneficiary of John's trust; Angela is the beneficiary of Angela's trust; and the beneficiary of Anthony's trust is not a party to these cases.  We collectively refer to John's trust, Anthony's trust, and Angela's trust as the trusts.  Petitioner is the only shareholder directly involved in Concrete's business.

Concrete is in the business of manufacturing ready-mix concrete, sand, and crushed gravel products.  Concrete owns six plants, two of which were closed at the time of trial, through which the company sells gravel, mulch, and masonry and landscaping materials to homeowners and contractors.  Petitioner, individually or

[*5] through Concrete, has since before 2004 purchased and sold real estate in New Jersey, and he has pursued the development of certain properties into a residential subdivision.

IV.     The Allen Wood Steel Property and the Subject Property

   A.     The Allen Wood Steel Property

Portions of the land contributed to the county, formerly the Allen Wood Steel property, was before 1979 mined extensively for its magnetite iron ore. Included on the Allen Wood Steel property was the Scrub Oaks Mine, one of the largest and oldest iron ore mines in New Jersey, reaching a total depth of 3,400 feet.

   B.     The Crimis' Acquisition of the Allen Wood Steel Property

In August 1979 the Crimis and Concrete purchased for $1,000 per acre 439 acres of land making up the Allen Wood Steel property, located partly in Mine Hill Township, New Jersey (township), and partly in the adjoining Borough of Wharton, New Jersey (Wharton). Initially, the Allen Wood Steel property was purchased for its natural resources. More specifically, in the years following the acquisition, a portion of the Allen Wood Steel property (approximately 125 acres) was used for sand and gravel reserves; a separate part (approximately 51 acres) was developed into an industrial park; and the balance (approximately 263 acres)

**[*6]** was zoned for residential use in the township and in Wharton.[4] Over time, petitioner came to pursue development of a portion of the Allen Wood Steel property for residential subdivision, including three adjacent parcels of land (subject property) at issue in these cases.[5]

C.     The Subject Property

The subject property, approximately 65.5 acres of mostly vacant land, is located within the township's single-family residential and townhouse zoning areas. The subject property is encumbered by an approximately 13-acre utility easement, reducing the net developable land of the subject property to approximately 52.5 acres. The indicated equalized value (i.e., property value for real property tax assessment purposes) of the subject property in 2004, consisting entirely of undeveloped land, was $1,005,851.

---

[4]Testimony was elicited at trial to the effect that 200 acres only was zoned for residential development. We understand the balance of the Allen Wood Steel property, or 263 acres, to have been zoned for residential development purposes.

[5]The subject property included block 101, lot 1 (owned by Concrete); block 201, lot 1 (owned by Ms. Crimi); and block 702, lot 12 (owned by petitioner). At various points between 2002 and through 2004, portions of the subject property were regranted to individuals in order to effect the transfer to the county. Our references to the subject property are to the foregoing parcels as modified following the regrants.

**[\*7]**   The subject property sits on the easterly facing slope of Iron Mountain.  The property's topography, affected by years of ore mining, is extremely rugged with open mining pits, prior excavations, and sinkhole pockmarks on the surface.  The effects of the ore mining activity are, however, confined and remediable.  For example, properly sealing shaft No. 1 of the Scrub Oaks Mine, considered to be a critical hazard associated with developing the subject property, would cost approximately $30,000.[6]  Notwithstanding the defects, and as discussed more fully below, petitioner investigated subdivision of the subject property in or about 1997.

The subject property did not receive preliminary or final approvals for the proposed subdivision nor any related approvals; e.g., sewer and water allocation approvals, soil erosion and sediment control approvals, utilities approvals, or (as explained below) wetland transition averaging buffer approvals.  This is not to say that the approvals could not have been obtained, but rather that no such approvals had been applied for or received.  As a practical matter, preliminary approvals typically could have been obtained in 18 months whereas final approvals typically took upwards of 3 years to secure.  We observe that as the number of lots to be

---

[6]The Scrub Oaks Mine was a steep-angled mine that ran through the middle of the proposed subdivision and on which a road was proposed to be built.  The shaft was improperly sealed in 1973 and needed to be resealed before the road could be safely built atop it.

**[*8]** placed into the subdivision increased, e.g., from 35 to 44, the approval process tended to grow more difficult.

Freshwater wetlands, including Granney Brook, are located on the subject property. Granney Brook, which divided the subject property north to south, is classified as a category 1 watercourse, trout production waters. Granney Brook, by virtue of its status as a category 1 watercourse, was recognized as the most protected type of watercourse in the State of New Jersey. See generally N.J. Stat. Ann. secs. 13:9B-7 (West 2003), 58:16A-67 (West 2006). Specifically, New Jersey law required a 50-foot vegetated buffer from atop of each bank to be provided in the area surrounding the watercourse. After April 2003 New Jersey also required that certain wetlands on the subject property, including Granney Brook, maintain a 300-foot transition area (i.e., buffer) in which most (if not all) development was prohibited. The 50-foot buffer eliminated roughly 160,000 square feet (3.6 acres) of developable land from the subject property, and the 300-foot buffer eliminated approximately 320,000 square feet (7.3 acres) of developable land from the subject property. Modifying the buffer zones, while not impossible, required extensive waivers and mitigation.

**[*9]** V.    <u>Failed Development and the Eventual Preservation of the Subject Property</u>

    A.    <u>Overview of the 1997 Proposed Residential Subdivision</u>

Petitioner has at all relevant times been a considerable real property owner in, and substantial payor of property taxes to, the township. In or around 1997 petitioner proposed to develop 58 acres (ostensibly making up the subject property) plus 72 acres he, Ms. Crimi, or Concrete owned in Wharton into a single-family and townhouse subdivision that was to be named Irondale Manor.[7] The Irondale Manor project, in toto, was to encompass 130 acres spanning two municipal jurisdictions and was to result in the subdivision of 189 single-family residential building lots. In addition to the residential dwellings, petitioner proposed to construct utilities, drainage improvements, and an internal roadway system.

    B.    <u>The Township's Preliminary Review of Irondale Manor</u>

As a preparatory step in developing Irondale Manor, petitioner hired James Brown, a professional engineer, to prepare a preliminary subdivision plan for the Irondale Manor subdivision in the township (Irondale Manor plan). Mr. Brown completed the Irondale Manor plan on or around January 30, 1997. The Irondale

---

[7]In addition to the properties making up the subject property, the township portion of the Irondale Manor project was to also include block 702, lot 10.

[*10] Manor plan, proposing a 59-lot subdivision of the subject property, was submitted to the township's planning board (board) for preliminary review. On March 11, 1997, the township held a regular board meeting at which the attendees conducted a completeness review of the Irondale Manor plan.[8] The board determined that the Irondale Manor plan was incomplete and that it was appropriate to withhold review until Mr. Brown submitted to the board, among other items, an Environmental Impact Statement (EIS).[9] The board also noted that petitioner should be prepared to address issues of wetlands, detention basis, and

---

[8]Under New Jersey land use law, a developer may request that the board provide an informal review of a concept plan for a development for which a developer intends to prepare and submit an application for development. N.J. Stat. Ann. 40:55D-10.1 (West 2008). This informal review is known as a completeness review. As noted in Kite v. Twp. of Pennsville Planning Bd., 2010 WL 693941 (N.J. Super. Ct. App. Div. 2010), "[c]ompleteness review is an administrative process to determine whether an application can proceed. It is not a review or hearing on the merits and does not require a public hearing. Its purpose is to determine whether the applicant has submitted sufficient documentation to proceed to a hearing on the merits." (Internal quotation marks omitted and alteration in original).

[9]Some New Jersey townships require applicants to file an Environmental Impact Statement for all preliminary subdivisions. See, e.g., N.J. Stat. Ann. sec. 13:19-6 (West 2003) (for a development in coastal areas); Dowel Assocs. v. Harmony Twp. Land Use Bd., 956 A.2d 349, 353-354 (N.J. Super. Ct. App. Div. 2008); In re Application of State of New Jersey, 2007 WL 1574403 (N.J. Super. Ct. App. Div. 2007); Taft v. Upper Freehold Twp. Planning Bd., 2007 WL 1261121 (N.J. Super. Ct. App. Div. 2007). Our search for a copy of the Township Code, assuming one exists, did not return any results.

**[*11]** depressions associated with the subject property. Mr. Brown, who attended the meeting, stated that petitioner would submit the missing items as well as an EIS.

C.    The Completeness Review Letter

Six days after the completeness review meeting, on March 17, 1997, John Cilo, Jr., the board's engineer and planner, sent to the board's chairman a letter (completeness review letter) detailing upwards of 65 items to be addressed before the Irondale Manor plan would be approved. The many defects cited in the completeness review letter were not unusual when compared with other completeness review letters typically issued for a major subdivision plan. The more significant defects noted were a letter of interpretation that was needed from the NJDEP to determine the extent the wetlands associated with Granney Brook; the location of mines under certain lots; the required stormwater management and detention; and the necessary approvals or permits with respect to sanitary sewer and water, wetland disturbances, stream encroachment. Petitioner was made aware of the completeness review letter as well as the issues that needed to be addressed before the township might approve the Irondale Manor subdivision.

**[*12]** D.    The EIS

Connolly Environmental, Inc. (CEI), produced to petitioner an EIS on or

about March 25, 1997.  The EIS stated as follows:

> Areas of freshwater wetlands are found on the [subject] property.  These are associated with Spring Brook and its tributaries, including Granney Brook.  Spring Brook and Granney Brook flow in a north, northeasterly direction and are tributary to Jackson Brook in the Rockaway River watershed of the Passaic River Drainage.  Freshwater wetlands and waters are natural features which are regulated by the New Jersey Department of Environmental; [sic] Protection (NJDEP).  The wetlands and state open waters are in the process of being delineated and the delineation will be submitted by * * * [CEI] to NJDEP for confirmation in a Letter of Interpretation (LOI).  The wetland areas associated with Granney Brook are vegetated with a Red Maple, Spicebush, Skunk Cabbage association.  Since the on-site wetlands are tributary to the Passaic River Drainage they are anticipate [sic] to be classified by NJDEP as * * * [U.S. Environmental Protection Agency] priority wetlands.  In addition on-site wetlands have been confirmed by NJDEP as documented habitat for a threatened and endangered species.  Therefore, the resource classification of these wetlands will be "exceptional" and transition areas of 150.0 feet will be imposed.  **These designations will affect the manner in which the site is developed but will not pose any major impediment to site development.**

The EIS also noted that in addition to a variety of other wildlife species, the wood

turtle was observed on the subject property.  The New Jersey Administrative Code

listed the wood turtle as a threatened species in 2003, N.J. Admin. Code sec. 7:7A,

Appendix 1 (2003), meaning the wood turtle might become endangered if

**[*13]** conditions surrounding it began to or continued to deteriorate, id. sec. 7:25-4.1 (2001).

E.     Petitioner's Decision Not To Pursue Residential Development

Petitioner did not revise the Irondale Manor plan or pursue preliminary or final approvals with respect to the subdivision.  In 1997 or 1998, following discussions with the township's mayor and administrator, Barry Lewis, petitioner opted not to pursue residential development of the subject property.  The record does not explain the reason (if any) petitioner decided not to develop the subject property; nor does the record clarify the scope of petitioner's discussions with the mayor.

F.     Municipalities' Interest in Preserving Irondale Manor

In or about 1999 or 2000 Wharton, the municipality abutting the township, sought to acquire approximately 130 acres of land for open space purposes; i.e., land to be set aside, dedicated, designated, or reserved for public or private use or enjoyment or for the use and enjoyment of nearby land owners and occupants.  See N.J. Stat. Ann. sec. 40:55D-5 (West 2008).  Among the land identified as potential open space was a portion of Irondale Manor situated in Wharton.  Administrative officials for the township similarly expressed their desire to acquire the subject property to preserve open space and as a means of avoiding further development

[*14] in the township. The township's town administrator, Mr. Lewis, approached petitioner as to petitioner's interest in preserving the subject property for open space purposes. Petitioner was willing to listen to the administrator's proposal; and during preliminary discussions, petitioner indicated his belief that the subject property was worth approximately $3 million. Petitioner subsequently procured an appraisal, purporting to value the subject property.

VI.   The 2000 Appraisal

In or around March 2000 petitioner hired Alan D. Jones and Charles V. Beyer of Beyer Williams Associates (Beyer Williams) to appraise the subject property.[10] In an appraisal report on a residential subdivision known as Irondale Manor dated March 21, 2000 (2000 appraisal), Messrs. Jones and Beyer determined the fee simple market value of the subject property as $2.95 million as of March 2, 2000.

The 2000 appraisal used the direct sales comparison approach to value the subject property. The 2000 appraisal determined that the highest and best use of

---

[10]The parties have stipulated the report valued approximately 64.5 acres, consisting of block 201, lot 1 (approximately 31.73 acres), block 702, lot 12 (approximately 9.07 acres), and block 101, lot 1 (approximately 23.72 acres). However, page 7 of the 2000 appraisal states that it valued part of block 101, lot 1, and its summary states that it valued part of block 101, lot 7. Moreover, the subject property included block 101, lot 1 (owned by Concrete); block 201, lot 1 (owned by Ms. Crimi); and block 702, lot 12 (owned by petitioner).

[*15] the subject property was single-family residence development. The 2000 appraisal stated the report as being "for discussion purposes with township officials." The 2000 appraisal assumed that the estimate of value would not be negatively affected by the possible location of wetlands on or around the property. The 2000 appraisal stated that the author was not aware of any mines or mine shafts on the subject property.

The 2000 appraisal noted that the subject property had not received formal approvals of any type, and consequently, the 2000 appraisal considered the land bulk residential land. The 2000 appraisal used a standard of market value as opposed to fair market value, and it did not include a statement that the report was prepared for income tax purposes. The 2000 appraisal was made more than four years before the transfer date, and the appraisal did not appraise the property as of that date. Nor did the appraisal include the date or expected date of the contribution. The 2000 appraisal assumed that the subject property would not be negatively affected by the possible location of the wetlands on or around the property, and it stated the appraisers' erroneous understandings that there were no mines on the subject property.

**[*16]** The 2000 appraisal stated that

> The owner [sic] has received various inquiries from reputable land developers * * * about the availability of the tract.  These offers were in the range of $1,350,000 to $1,550,000 or $20,924 per acre or $24,024 per acre respectively.  These offers are considerably less than our estimated value of $2,950,000 or $45,722 per acre.  This is appropriate as these offers reflect quick closing transactions with absolutely no contingencies. * * *

The 2000 appraisal concluded that the market value of the property valued (i.e., three of the four lots included with the subject property) was $2,950,000 as of March 2, 2000.  Messrs. Jones and Beyer signed the 2000 appraisal.  The parties have stipulated Mr. Jones is a qualified appraiser.

VII.   The Preservation Partnership

The township was unable to purchase the subject property outright because of financial constraints, and in mid-2002 the town administrator identified alternate funding sources in the form of a partnership among the township, the Morris County Municipal Utilities Authority (MCMUA) acting on behalf of Morris County (county), and the Morris Land Conservancy (conservancy) (collectively, preservation partnership) to preserve the subject property for open space purposes.  Under the preservation partnership agreement, the county contributed $1.5 million from its open space trust fund, MCMUA paid $50,000,

[*17] and the township paid for soft costs, including survey and environmental costs.[11]

On October 8, 2003, the Crimis and Concrete entered into a contract of sale with the county to sell the subject property to the county for $1,550,000. Under the contract, the subject property was sold subject to "a perpetual easement in favor of the Morris County Municipal Utilities Authority for the conservation of the natural open space character of its property" and the transfer in perpetuity to MCMUA all of the Crimis' and Concrete's interest and title to certain water and land rights[12].

---

[11]Respondent argues for the first time on his posttrial brief that only the county was the donee. In their reply, petitioners contend the members of the preservation partnership along with the county were the donees. While the record supports petitioners' contention, we also believe, as we will explain later in this opinion, the preservation partnership was acting on behalf of the county under New Jersey's agency principles.

[12]These rights included:

[the Crimis' and Concrete's] rights, title and interest, in perpetuity, to all water in, upon, under and throughout the property together with the absolute right to reasonably extract, remove, pump and store the same at, in, upon and throughout the property and to construct, maintain, improve, renew, replace, enlarge and operate such works, wells, pipelines and other facilities as shall be useful and convenient in the development by the MCMUA of its Water System, as defined in N.J.S.A. 40:14B-3(8), as the same may be amended and supplemented.

[*18] Mr. Lewis reported the contract of sale to the township's board during its regular meeting held on May 25, 2004. The minutes of the meeting show Mr. Lewis advised the board that the Crimis and Concrete had entered into the sale contract with the preservation partnership for the acquisition and preservation of the subject property. Mr. Lewis also indicated on a map the properties to be acquired and designated as open space.

VIII. 2003 Appraisal

In or around February 2003 MCMUA hired Robert Cooper of Landmark I Appraisal, LLC, to appraise two lots making up the subject property as well as a portion of the third lot making up the subject property.[13] In an appraisal report dated April 2, 2003 (2003 appraisal), Mr. Cooper determined the market value of the property appraised to be $1.9 million as of March 6, 2003. The land appraised totaled approximately 74.8 acres (as compared with the approximately 65 acres making up the subject property). The 2003 appraisal used the sales comparison approach to value the property in question, and even though the appraisal recognized that the indicated value should be obtained from three approaches and reconciled in a final value estimate, the 2003 appraisal used only one approach.

---

[13]The 2003 appraisal valued block 702, lot 12, block 201, lot 1, and a portion of block 101, lot 1.

**[*19]** IX.  Transfer of the Subject Property and Apportionment of Value

On or about July 30, 2004 (contribution date or valuation date), the Crimis and Concrete deeded the subject property to the county for $1,550,000.  For Federal income tax purposes, however, petitioners treated the subject property's market value as $2.95 million, the appraised amount under the 2000 appraisal.  The claimed $2,950,000 market value was apportioned among the three parcels on the basis of their assessed values for real estate tax purposes.  Specifically, petitioners apportioned the stated market value as follows:

| Property | Owner | Apportioned market value |
|---|---|---|
| Block 101, lot 1 | Concrete | $1,810,149 |
| Block 201, lot 1 | Ms. Crimi | 942,578 |
| Block 702, lot 12 | Petitioner | 197,273 |
| Total | | 2,950,000 |

X.  August 16 Letter

On August 16, 2004, the township's administrator, Mr. Lewis, wrote and signed a letter (August 16 letter) to the Crimis and Concrete acknowledging the contribution of block 101, lot 1, block 201, lot 1, and block 703, lot 12.  The August 16 letter was provided and signed by Mr. Lewis on the township's letterhead, which in part stated:  "On behalf of the MCMUA, the Morris Land Conservancy, and the Township of Mine Hill and its residents, I would like to

[*20] express our deep appreciation for your generosity in making this donation and allowing us to preserve this valuable and environmentally important property." The August 16 letter also included the following statement:

> As you know, this property was appraised by Beyer Williams Associates for a total value of TWO MILLION NINE HUNDRED AND FIFTY THOUSAND DOLLARS ($ 2,950,000) and you conveyed the property to the Morris County MUA, the Morris Land Conservancy and the Township of Mine Hill for a total of ONE MILLION FIVE HUNDRED AND FIFTY-FIVE THOUSAND DOLLARS ($1,550,000), and making a charitable donation to our open space preservation efforts of the remaining equity in the amount of ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000).

XI.   Mr. LaForge and Sobel

Michael LaForge was at all relevant times licensed in New Jersey as a certified public accountant and member of Sobel & Co., LLC (Sobel), which was a reputable regional C.P.A. firm established in 1956 that has over 75 accountants. Mr. LaForge joined Sobel in 1980 and has been a member of the firm since 1987. By 2004 Mr. LaForge had provided accounting, tax, and financial services to Mr. Crimi and Concrete for over 24 years as their accountant. Since at least 1990 Mr. LaForge had been in charge of managing the client relationship with Mr. Crimi and Concrete on behalf of Sobel, and on the basis of that engagement he was intimately familiar with the financial affairs of Mr. Crimi and Concrete.  Mr.

[*21] LaForge, who was experienced in preparing tax returns reporting charitable contributions, prepared each of the returns at issue.

XII.  Federal Income Tax Returns, Notices of Deficiency, and Amended Answer

A.  Overview

Petitioners claimed charitable contribution deductions totaling $1.4 million, calculated as the difference between the subject property's market value as stated in the 2000 appraisal ($2,950,000) and the 2004 sale price ($1,550,000).  More specifically, the deductions inured to petitioners' benefit either by virtue of their direct ownership in the subject property (in the case of the Crimis) or by virtue of their direct or indirect ownership interest in Concrete (in the case of petitioner, John and Charla Crimi, and Edward and Angela Mintel).  We consider the Federal income tax return reporting of each deduction for each taxpayer for each year.

B.  Concrete

1.  2004 Concrete Return and Notice of Deficiency

Concrete filed Form 1120S, U.S. Income Tax Return for an S Corporation (2004 Concrete return), for the taxable year ending September 30, 2004.  The 2004 Concrete return claimed charitable contribution deductions totaling $1,147,792, of which $859,054 was attributable to that parcel on the subject property owned by Concrete; i.e., block 101, lot 101.  Concrete, by virtue of its election to be treated

[*22] as an S corporation, passed through to its shareholders (i.e., petitioner and the trusts) their distributive share of income, gains, losses, deductions, and credits. The trusts in turn passed through to their respective beneficiaries the trusts' items of income, gains, losses, deductions, and credits.  Thus, Concrete's $859,054 charitable contribution deduction was allocated to petitioner and the trusts, and reported to them on Schedules K-1, Shareholder's Share of Income, Deductions, Credits, etc., as follows:

| Shareholder | Contribution |
| --- | --- |
| Petitioner | $753,104 |
| John's trust | 35,316 |
| Anthony's trust | 35,319 |
| Angela's trust | 35,315 |
| Total[1] | 859,054 |

[1]Notwithstanding the fact that the 2004 Concrete return reported Concrete's charitable contribution deduction as $859,054, the parties stipulated the charitable contribution deduction allocated to the shareholders was $859,055.  We accept the amounts allocated to the shareholders as the amounts reported on the return, not the amounts stipulated by the parties.  Cf. Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976) (the Court need not accept stipulations contrary to facts disclosed by the record).

The 2004 Concrete return, prepared and signed by Mr. LaForge, attached copies of the 2000 appraisal, the second page of Form 8283, Noncash Charitable

[*23] Contributions, and the August 16 letter.[14]  The Form 8283 described the donated property as "Land Block 1, Lot 1" and summarized the physical condition of the donated property as undeveloped land as described in the attached 2000 appraisal.   Mr. Lewis, in his capacity as the township administrator, signed the Form 8283 on behalf of the members of the preservation partnership.

Respondent disallowed the charitable contribution deduction of $859,054 as claimed on the 2004 Concrete return.  By virtue of Concrete's status as a flow-through entity, the disallowance resulted in individual adjustments to the shareholders' 2004 returns.[15]

### 2.    2005 Concrete Return and Notice of Deficiency

Concrete filed Form 1120S (2005 Concrete return) for the period ending September 30, 2005, and claiming charitable contributions totaling $181,899.

---

[14]Mr. Beyer did not sign the Form 8283.

[15]Respondent did not determine any additions to tax or penalties in the notices of deficiency in these cases.

**[*24]** C.　John C. Crimi and Susan Crimi (Docket Nos. 13252-09, 13262-09, and 20519-09)

　　　　1.　Crimis' 2004 Return and Notice of Deficiency, and Amended Answer

The Crimis filed Form 1040, U.S. Individual Income Tax Return (Crimis' 2004 return), for the 2004 year. The Crimis' 2004 return, prepared by Mr. LaForge, claimed charitable contribution deductions of $540,946 with respect to the two parcels making up the subject property petitioners owned individually; i.e., block 201, lot 1 and block 702, lot 12. In addition, the Crimis' 2004 return claimed petitioner's pro rata share of the charitable contribution deduction of $753,098 as reported on the 2004 Concrete return. Thus, the Crimis claimed charitable contribution deductions totaling $1,294,044 relating to their donation of the subject property. In addition, the Crimis reported capital gains of $585,516 from the sale of the two parcels making up the subject property they owned individually. Schedule E, Supplemental Income and Loss, attached to the Crimis' 2004 return reported petitioner's pro rata share of income, losses, gains, deductions, and credits. After aggregating the Crimis' shares of the charitable contribution deductions and the trusts' shares of the charitable contribution

**[\*25]** deductions, petitioners claimed charitable contribution deductions totaling

$1.4 million.[16]

The parties stipulated the Crimis claimed charitable contribution deductions

totaling $1.4 million and calculated as follows:

| Petitioner | Claimed fair market value | Sale price | Claimed charitable contribution deduction |
|---|---|---|---|
| Ms. Crimi | $942,578 | $495,253 | $447,325 |
| Petitioner | 197,273 | 103,652 | 93,621 |
| Petitioner's pro rata share from Concrete | 1,586,872 | 833,780 | 753,098 |
| Total | | | 1,294,044 |

[1]We observe that despite the parties' stipulation the amounts reported do not total $1.4 million. We are unable to reconcile this difference.

The Crimis' 2004 return attached copies of (1) page 2 of Form 8283 for

block 702, lot 12, (2) page 2 of Form 8283 for block 201, lot 1, (3) the August 16

letter, and (4) the 2000 appraisal. The Forms 8283 attached to the Crimis' 2004

return were signed by Mr. Jones, the author of the 2000 appraisal, and

acknowledged by Mr. Lewis. The Forms 8283 described the donated property as

"Land - Block 201, Lot 1" and "Land - Block 702, Lot 12" and each summarized

the physical condition of the donated property as undeveloped land as described in

---

[16]Although the parties stipulated petitioners claimed charitable contribution deductions totaling $1.4 million, the Crimis' 2004 return makes clear that they claimed charitable contributions totaling $1,381,133.

[*26] the attached 2000 appraisal.  Mr. Lewis, in his capacity as the township administrator, signed the Forms 8283 on behalf of the members of the preservation partnership.

Respondent issued to the Crimis a notice of deficiency for 2004. Respondent disallowed charitable contribution deductions of $540,946 as claimed on the Crimis' 2004 return with respect to the two parcels they owned which also made up a portion of the subject property.  As stated above, the Crimis claimed charitable contribution deductions totaling $1,294,044 on their return for 2004. The parties have stipulated the notice of deficiency issued to the Crimis for 2004 inadvertently omitted petitioner's pro rata share of Concrete's charitable contribution in calculating the disallowed deduction.  In addition, the parties stipulated the amount of the charitable contribution deduction respondent intended to disallow was $1,294,044.  Respondent, in an amended answer, asserted a $263,584 increase in the Crimis' 2004 tax deficiency, thereby increasing the total deficiency due from the Crimis for 2004 to $429,613.  Respondent concedes that he bears the burden of proof with respect to the increased deficiency of $263,584.  The parties have stipulated the carryover charitable contribution for 2005 is subject to computational adjustments due to petitioner's adjusted gross income and due to resolution of the charitable contribution deduction for 2004.

**[\*27]**        2.        <u>John C. Crimi's 2005 Return and Notice of Deficiency</u>

Petitioner filed Form 1040, U.S. Individual Income Tax Return (petitioner's 2005 return) for 2005 on which he elected a filing status of single and claimed an excess charitable contribution carryover of $227,349.  Respondent issued to petitioner a notice of deficiency for 2005 on the basis of the excess charitable contribution carryover from 2004.  The parties have stipulated petitioner's itemized deduction for 2005 is subject to computational adjustments due to the change in petitioner's adjusted gross income and determination of charitable deduction carryover in 2005.

D.        <u>John J. and Charla Crimi (Docket No. 22531-09)</u>

John J. and Charla Crimi filed Form 1040 for 2004 (John and Charla's 2004 return).   Schedule E attached to John and Charla's 2004 return reported John's trust's pro rata share of Concrete's items of income, deduction, gain, loss, and credit, including charitable contribution deductions totaling $40,862.  Respondent issued to John and Charla Crimi a notice of deficiency for 2004.  John and Charla's 2005 tax year is not before the Court.

[*28] E.    Edward and Angela Mintel (Docket Nos. 22374-09 and 22417-09)

1.    Edward and Angela's 2004 Return and Notice of Deficiency

Edward and Angela Mintel filed Form 1040 for 2004 (Edward and Angela's 2004 return).  Page 2 of Schedule E attached to Edward and Angela's 2004 return reported Angela's trust's pro rata share of Concrete's items of income, deduction, gain, loss, and credit, including the $35,316 charitable contribution deduction that was attributable to the county's claimed portion of the charitable contribution. Respondent issued to Edward and Angela Mintel a notice of deficiency for 2004. The parties have stipulated that the only remaining issue in docket No. 22374-09 is whether Edward and Angela are entitled to the charitable contribution deduction claimed for 2004.

2.    Edward and Angela's 2005 Return and Notice of Deficiency

Edward and Angela Mintel filed Form 1040 for 2005 (Edward and Angela's 2005 return).  Respondent issued to Edward and Angela Mintel a notice of deficiency for 2005 on the basis of the excess charitable contribution carryover from 2004.  The parties have stipulated the only remaining issue in docket No. 22417-09 is whether Edward and Angela are entitled to the charitable contribution deduction claimed for 2004.

**[\*29]** XIII.   <u>Preparation of Petitioners' Federal Income Tax Returns</u>

For purposes of preparing the 2004 and 2005 Federal income tax returns for petitioner and Concrete, Mr. LaForge had complete access to all documents concerning petitioner's and Concrete's financial and accounting matters, which were either at petitioner's home or in Concrete's office.  In addition to 30 to 40 telephone conversations, Mr. LaForge and petitioner met together personally six to eight times in 2004 to discuss tax planning-related matters.

Mr. LaForge, who had known about and been regularly updated on the contemplated part-gift, part-sale transaction since 1998, requested from petitioner a copy of the 2000 appraisal for the 2004 tax return.  Petitioner provided the 2000 appraisal to Mr. LaForge as requested, knowing only that an appraisal was necessary to claim a charitable contribution deduction.  The 2000 appraisal was the only appraisal petitioner provided to Mr. LaForge to prepare the returns at issue.

Mr. LaForge was aware when he prepared the returns at issue that the Code and the regulations specified detailed requirements for claiming a charitable contribution deduction.  He also knew that the 2000 appraisal did not meet each of the rules to be considered a qualified appraisal even though the Code and the regulations required petitioners to obtain a "qualified appraisal" before claiming a

[*30] charitable contribution deduction.  Knowing the 2000 appraisal did not meet the literal requirements to be a qualified appraisal, he consulted with and was advised by Ken Hydock[17] of Sobel's tax department, who determined the 2000 appraisal was a valid appraisal in substantial compliance with the regulations.  Outside of explaining to petitioner that an appraisal of the subject property was required in order to claim a charitable contribution deduction, Mr. LaForge did not explain to petitioners any other rules for claiming a charitable contribution deduction.  Mr. LaForge did not explain that the 2000 appraisal did not comply with the rules for a qualified appraisal.  Nor did Mr. LaForge advise petitioner that there was at least a possibility that petitioner would not prevail on the substantial compliance argument.  Mr. LaForge did not advise petitioner to obtain a new appraisal, and he did not give petitioner reason to seek advice as to the value of the subject property as of the contribution date.

XIV.  Examination of Petitioners' Returns

Respondent selected petitioners' returns for the years at issue for audit, and he assigned Revenue Agent Christine Gallagher to examine those returns.  During the examination, petitioner hired Mr. Jones to perform an updated appraisal of the subject property.  Petitioner or Mr. LaForge submitted to respondent an appraisal

---

[17]Mr. Hydock held a law degree and was a C.P.A.

**[*31]** of the subject property dated June 20, 2007 (2007 appraisal). The 2007 appraisal, prepared and signed by Mr. Jones and Thomas S. Kachelriess of Professional Appraisal Associates, valued the subject property as of July 30, 2004.

XV.   2007 Appraisal

The 2007 appraisal valued the subject property at $5,225,000 as of the contribution date. It also included the date of contribution and the accurate acreage that was transferred. It also contained a statement that the appraisal was prepared for "Internal Revenue purposes."

XVI. Trial of These Cases

A.   Overview

A trial was held in New York, New York (Newark trial session), on December 16, 2012, and from December 22 through December 23, 2012. Four fact witnesses and four expert witnesses testified at the trial.

B.   Expert Testimony

1.   Petitioners' Expert Witnesses

a.   Mr. Blethen

Petitioners offered Marvin R. Blethen as an expert on civil engineering and mining engineering, and the Court recognized Mr. Blethen as an expert on mining engineering. Mr. Blethen holds a bachelor of science degree in mining

[*32] engineering from West Virginia University, a master's degree in mining engineering from the University of Idaho, and a master of business administration degree from the Troy State University.  Mr. Blethen has more than 30 years' experience as a professional engineer, and he is licensed as a professional engineer in 12 States.  He is a member of the National Society of Professional Engineers and the Society of Mining Engineers.

### b.    Mr. Holenstein

Petitioners offered, and the Court recognized, Michael Holenstein as an expert on real estate valuation.  Mr. Holenstein holds a bachelor of arts and science degree from Upsala College, and he has achieved the MAI designation from the Appraisal Institute.  He is a licensed certified general real estate appraiser in New Jersey, New York, and Pennsylvania, and the State of New Jersey has certified him as a tax assessor.  He has been qualified as an expert in at least one Federal bankruptcy court, in the Tax Court of New Jersey, in the Superior Court of New Jersey, and before various quasi-judicial boards in connection with condemnation proceedings.

**[*33]**       2.       Respondent's Expert Witnesses

          a.       Mr. Rinaldi

Respondent offered, and the Court recognized, Anthony J. Rinaldi as an expert in real estate valuation.  Mr. Rinaldi holds a bachelor's degree in applied science from New York University, and he has around 35 years' experience appraising real estate.  He is a member of the Appraisal Institute and the American Society of Appraisers, and he holds the MAI designation.

          b.       Mr. Morris

Respondent offered, and the Court recognized, Jeffrey Morris as an expert in civil engineering.  Mr. Morris has more than 32 years of experience in engineering, all of which was with Boswell Engineering in New Jersey.  He earned a bachelor of science degree in civil engineering from Lehigh University.  He is a licensed as a professional engineer, a professional land surveyor, a professional surveyor, a professional planner, and a certified municipal engineer.  He is a member of the New Jersey Society of Professional Land Surveyors and the New Jersey Society of Municipal Engineers and a past president of the Society of Professional Engineers.

**[\*34]** C.     Concurrent Witness Procedure

The Court, following a pretrial request from the parties, directed the expert witnesses to testify concurrently.  The procedure was implemented in substantially the same way as in Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225, 102 T.C.M. (CCH) 264, 271 (2011).  Insofar as the record includes five appraisals (the 2000 appraisal, the 2004 appraisal, the 2007 appraisal, Mr. Rinaldi's appraisal report, and Mr. Holenstein's appraisal) indicating a proffered value of $660,000, as with Mr. Rinaldi's appraisal, to $5,225,000, as with the 2007 appraisal, we cannot overstate the importance of concurrent witness testimony in these cases.  We describe more fully in the opinion section the benefits of the concurrent testimony and the impact on our analysis.

D.     Petitioners' Motion To Shift the Burden of Proof

Petitioners orally moved the Court at trial to shift the burden of proof to respondent with respect to the remaining factual issues in dispute.

OPINION

I.     Overview

Section 170(a)(1) generally allows taxpayers a deduction for any charitable contribution made during the taxable year.  Where, as here, the taxpayers receive a substantial benefit in return for a contribution of property, a deduction is permitted

**[\*35]** only to the extent that (1) the fair market value of the donated property exceeds the fair market value of the benefit conferred, and (2) the excess contribution is made with charitable intent and without the receipt or expectation of receipt of adequate consideration.  See Hernandez v. Commissioner, 490 U.S. 680, 690 (1986); United States v. Am. Bar Endowment, 477 U.S. 105, 116-117 (1986); see also Rolfs v. Commissioner, 135 T.C. 471, 480 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).  Taxpayers seeking to deduct charitable contributions must satisfy strict substantiation requirements fixed by reference to the amount of the deduction claimed.  See generally sec. 1.170A-13, Income Tax Regs.  As relevant here, for a contribution of property for which a deduction of more than $500,000 is claimed, taxpayers must obtain and attach to the Federal income tax return first claiming the deduction a qualified appraisal of the property.  Sec. 170(f)(11)(A), (C), (D).  Also relevant here is that taxpayers must substantiate a contribution of property for which a deduction of $250 or more is claimed with a contemporaneous written acknowledgment by the donee organization including the following information:  (1) the amount of cash and a description of any noncash property contributed; (2) a statement as to whether the donee organization provided to the donor any goods or services in whole or partial consideration for the contributed property; and (3) a description and a good-faith estimate of the

**[*36]** value of any goods or services the donee organization provided. Sec. 170(f)(8)(A) and (B). The substantiation requirements under section 170 are cumulative; that is, the substantiation requirements for a noncash contribution of more than $500,000 also include those for a contribution of $250 or more.

## II. Parties' Arguments

Respondent argues that petitioners are not entitled to the claimed charitable contribution deductions for three main reasons. First, he claims petitioners failed to obtain from the county a contemporaneous written acknowledgment as required by section 170(f)(8). Second, he asserts petitioners failed to attach to their Federal income tax returns a qualified appraisal as required by section 170(f)(11), section 1.170A-13(c), Income Tax Regs., and the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155, 98 Stat. at 691. Third, citing a highest and best use of conservation, he maintains the subject property's fair market value was $660,000 on the contribution date. Along that line, respondent argues that insofar as the value of the subject property did not exceed the consideration the preservation partnership paid, no deduction is allowed under section 170(a).[18]

---

[18]On brief, respondent abandons Mr. Rinaldi's alternative premise that the fair market value of the subject property was $1,510,000, and he is deemed to have waived that argument. See Rule 151(e)(4) and (5); Estate of Johnson v.

(continued...)

[*37] With respect to his final argument, respondent argues in the alternative that the fair market value of the subject property is limited to the consideration paid by the preservation partnership, or $1,550,000.

Petitioners assert that they transferred the subject property to the county in a part-sale, part-gift transaction, at which time the fair market value of the property was $3,760,000.[19] Petitioners claim entitlement to charitable contribution deductions totaling $2,210,000; i.e., the difference between the claimed fair market value of the subject property on the contribution date ($3,760,000) and the consideration received from the county ($1,550,000). In that regard, petitioners now assert that the fair market value of the subject property was higher than initially reported on their Federal income tax returns for the years at issue, and they (with the exception of John J. and Charla Crimi in docket No. 22531-09)

---

[18](...continued)
Commissioner, T.C. Memo. 2001-182, 82 T.C.M. (CCH) 206, 234 (2001) (and cases cited thereat), aff'd, 129 Fed. Appx. 597 (11th Cir. 2005). Rather than relying on Mr. Rinaldi's alternative development premise, respondent asserts for the first time on brief his alternative position that the subject property's fair market value on the valuation date is limited to the consideration the preservation partnership paid to acquire the subject property, or $1,550,000.

[19]Although petitioners claim on brief that the fair market value of the subject property was $3,761,000 on the valuation date using a 44-lot subdivision hypothesis, Mr. Holenstein was clear at trial that he valued a 44-lot subdivision at $3,760,000. We understand petitioners to rely on the opinion of Mr. Holenstein, and consequently, we recognize their claimed fair market value of the subject property as $3,760,000 and we shall refer to this amount throughout this opinion.

**[\*38]** claim entitlement to refunds for 2005.[20]  Additionally, petitioners assert that they actually or substantially complied with the recordkeeping requirements of section 170(f)(8) and (11), and DEFRA sec. 155, or alternatively, that the reasonable cause exception of section 170(f)(11)(A)(ii)(II) precludes disallowance of the charitable contribution deductions.

## IV.   Burden of Proof

The taxpayers generally bear the burden of proof in a deficiency proceeding such as this, see Rule 142(a), and the Commissioner ordinarily bears the burden of proof as to any increased deficiency, id.  The parties stipulate respondent bears the burden of proof in respect of petitioner's pro rata share of Concrete's charitable contribution deduction ($859,065) because that adjustment, pleaded by amended answer, increased the deficiency.  See Rule 142(a).

Petitioners moved the Court at trial to shift the burden of proof with respect to all factual issues not shifted to respondent under Rule 142(a).  We decline to do so, and therefore, we will issue an order denying petitioners' motion.  Section 7491(a) may, in certain limited circumstances, operate to shift the burden of proof to the Commissioner with respect to any factual issue relevant to determining the

---

[20]Because petitioners John J. and Charla Crimi's 2005 tax year is not before the Court, we do not include them as claiming entitlement to a refund for 2005.

[*39] taxpayers' Federal income tax liability. It is permitted to shift the burden of proof to the Commissioner only after the taxpayers introduce credible evidence as to the factually disputed issues and prove that they have complied with all relevant substantiation and recordkeeping requirements and have cooperated with the Commissioner's reasonable requests for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B).

We conclude that petitioners have not satisfied the substantiation and recordkeeping requirements for the burden of proof to shift to respondent as to all issues. As we explain in section VI.B, we decline to decide that petitioners complied with the substantiation and recordkeeping requirements of section 170(f)(11), section 1.170A-13(c)(3), Income Tax Regs. or DEFRA sec. 155. While reasonable cause may excuse their noncompliance for purposes of a deduction under section 170(f)(11)(A)(ii)(II), no parallel exception exists under section 7491. Accord H.R. Conf. Rept. No. 105-599, at 241 (1988), 1998-3 C.B. 747, 995 ("Taxpayers who fail to substantiate any item in accordance with the legal requirement of substantiation will not have satisfied the legal conditions that are prerequisite to claiming the item on the taxpayer's tax return and will accordingly be unable to avail themselves of this provision regarding the burden of proof. Thus, if a taxpayer required to substantiate an item fails to do so in the

**[\*40]** manner required \* \* \*, this burden of proof provision is inapplicable." (Fn. refs. omitted.)); see Quinn v. Commissioner, T.C. Memo. 2012-178, 103 T.C.M. (CCH) 1945, 1946-1947 (2012) (burden of proof did not shift absent evidence substantiating charitable contribution deductions); Kendrix v. Commissioner, T.C. Memo. 2006-9, 91 T.C.M. (CCH) 666, 668 (2006); see also Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 340 (2011) (burden of proof did not shift to the Commissioner in the absence of credible evidence on value); NHUSS Trust v. Commissioner, T.C. Memo. 2005-236, 90 T.C.M. (CCH) 374, 378 (2005) (same).[21] Accordingly, the burden of proof as to all issues not shifted to respondent under Rule 142(a) remains with petitioners.

IV.   The Experts' Reports and Testimony

A.      Approach to Evaluating the Experts' Opinions

An expert witness may be allowed to testify in a proceeding before this Court when his or her scientific, technical, or other specialized knowledge might help us to understand the evidence or decide a fact in issue. See Fed. R. Evid. 702.

---

[21]We are mindful of our decision to shift the burden of proof to the Commissioner in Dunlap v. Commissioner, T.C. Memo. 2012-126, 103 T.C.M. (CCH) 1689 (2012). In Dunlap, the taxpayers obtained a qualified appraisal and a contemporaneous written acknowledgment as required under sec. 170(f)(8) and (11). Because petitioners failed to likewise establish that they satisfied the requirements of sec. 170(f)(8) and (11), we decline to treat Dunlap as controlling on the issue of whether the burden of proof shifts to respondent.

**[*41]** An expert qualified to testify in a judicial proceeding owes a duty to the Court that transcends the duty to his or her client insofar as the expert must present his or her opinion, as well as the facts, data, and analysis on which he or she relied, neutrally and candidly. Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990); see also Estate of Mitchell v. Commissioner, T.C. Memo. 2002-98, 83 T.C.M. (CCH) 1524, 1530 (2002); Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160, 81 T.C.M. (CCH) 1869, 1890 (2001). Experts who breach their duty to the Court in order to advance their client's litigating position compromise their usefulness. We are mindful of the "cottage industry of experts who function primarily in the market for tax benefits", see Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 335 (2011), and our concerns about the helpfulness of expert testimony in one recent case, and in these cases, led us to have the experts testify concurrently, see Rovakat, LLC v. Commissioner, 102 T.C.M. (CCH) at 271; see also Michael R. Devitt, "A Dip in the Hot Tub: Concurrent Evidence Techniques for Expert Witnesses in Tax Court Cases", 118 J. Tax'n 213 (Oct. 2012) (discussing the concurrent testimony process more fully). The concurrent testimony in these cases enabled us to more easily separate the reliable portions of the expert reports from the unreliable, and consequently, to expedite our decisionmaking process.

[*42] Our discretion to accept or reject an expert's analysis in whole or in part is broad. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 294-295 (1938); see also Whitehouse Hotel Ltd. P'ship v. Commissioner, 615 F.3d 321, 330 (5th Cir. 2010), vacating and remanding 131 T.C. 112 (2008); Malachinski v. Commissioner, 268 F.3d 497, 505 (7th Cir. 2001), aff'g T.C. Memo. 1999-182, 77 T.C.M. (CCH) 2092 (1999); Sammons v. Commissioner, 838 F.2d 330, 333-334 (9th Cir. 1988), aff'g in part, rev'g in part T.C. Memo. 1986-318, 51 T.C.M. (CCH) 1568 (1986); Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), aff'g in part, rev'g in part T.C. Memo. 1983-200, 45 T.C.M. (CCH) 1283 (1983). At times, an expert helps us to decide a case. E.g., Booth v. Commissioner, 108 T.C. 524, 573 (1997); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C. Ltd. v. Commissioner, T.C. Memo. 1997-96, 73 T.C.M. (CCH) 2098, 2103 (1997); Estate of Proios v. Commissioner, T.C. Memo. 1994-442, 68 T.C.M. (CCH) 645, 649 (1994). Other times, he or she does not. E.g., Estate of Gallagher v. Commissioner, T.C. Memo. 2011-148, 101 T.C.M. (CCH) 1702, 1714 (2011), as supplemented T.C. Memo. 2011-244, 102 T.C.M. (CCH) 388 (2011); Trout Ranch, LLC v. Commissioner, T.C. Memo. 2010-283, 100 T.C.M. (CCH) 581, 585 (2010), aff'd, ___ Fed. Appx. ___ (10th Cir. Aug. 16, 2012); Ludwick v. Commissioner, T.C. Memo. 2010-104, 99 T.C.M. (CCH) 1424,

**[*43]** 1425-1426 (2010); Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, aff'd without published opinion, 116 F.3d 1476 (5th Cir. 1997); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, 69 T.C.M. (CCH) 2852 (1995), affd. without published opinion, 91 F.3d 124 (3d Cir. 1996). We need not accept an expert's opinion in its entirety, see Parker v. Commissioner, 86 T.C. 547, 562 (1986), and we are not bound by an expert's opinion that is contrary to our own judgment, see Chiu v. Commissioner, 84 T.C. 722, 734 (1985).

B.     Expert Reports

1.     Overview

In total, four appraisal reports were admitted into evidence relevant to the fair market value of the subject property:  the 2000 appraisal; the 2007 appraisal; Mr. Holenstein's appraisal report revised November 30, 2011 (Holenstein report); and Mr. Rinaldi's appraisal report dated November 9, 2011 (Rinaldi report).  We focus on the latter two.  Also, two engineering reports were accepted into evidence as to the feasibility of developing the subject property into a residential subdivision:  an undated engineering viability analysis by Mr. Morris (Morris report); and a ground-penetrating radar survey by Mr. Blethen dated November 4, 2011 (Blethen report).  We also focus on these reports.  We refer to Messrs.

**[*44]** Morris and Blethen as the engineers, and we refer to Messrs. Rinaldi and Holenstein as the appraisers. We begin with the engineers' reports.

### 2. The Engineers' Reports

#### a. The Morris Report

The Morris report is an engineering viability analysis of the proposed 59-lot subdivision plan petitioner submitted to the township in 1997. Citing various factors affecting the developability of the subject property into a 59-lot subdivision, primarily the "environmentally sensitive character of the [subject] property", the Morris report concluded it was not feasible to develop the subject property into a subdivision of so many lots. Instead, the Morris report concluded that "the most number of lots that have any possibility of approval from the submitted subdivision are 44 lots." The Morris report also noted that additional unknown areas including wetlands, mine holes, or potentially endangered species might further reduce the number of developable lots.

Notwithstanding his conclusion that the subject property was developable into, at most, a 44-lot subdivision, Mr. Morris offered engineer's cost estimates of the onsite and offsite improvements for a 59-lot subdivision. Examples of the required improvements included infrastructures such as roadways, drainage, utilities, sanitary sewers, and other items mandated by ordinance and New Jersey's

**[*45]** Residential Site Improvement Standards.  The Morris report also estimated the cost of additional items cited as defects in the completeness review letter; e.g., an additional water main extension, sidewalk grading, streetlights, trees, signs, and stormwater management facilities.  Additionally, the Morris report added a 20% contingency to all construction costs as allowed by New Jersey law.  See N.J. Stat. Ann. sec. 40:55D-53a.  The Morris report reviewed land use regulations in effect in January 1997, as well as municipal, county, and State regulations promulgated between 1997 and July 30, 2004.

b.      The Blethen Report

Fundamentally, the Blethen report communicated Mr. Blethen's findings as to the presence of possible mine tunneling or mine shaft activity in the vicinity of the proposed Irondale Manor subdivision.  To determine the effects of the mining activity, Mr. Blethen engaged a third party, GeoModel, Inc. (Geo), to perform a ground-penetrating radar (GPR) survey of the subject property.  The GPR survey, a generally accepted technique in the mining field, uses equipment to reflect radio or sonic pulses off of the earth's bedrock to image the subsurface of the subject property.  The imaged results are intended to show variations in the property's subsurface.

**[\*46]**  The results of the GPR survey, and Mr. Blethen's visual site inspection, detected prior mines on the subject property.  The Blethen report concluded that the mine shafts should be sealed to a depth of at least 25 feet, and Mr. Blethen testified at trial that the effects of the mines could be remediated for approximately $110,000.  The Blethen report and Mr. Blethen's trial testimony, in toto, established the feasibility of developing the subject property into a residential subdivision so long as the prior effects of the mining operations were remediated by a competent engineer.

c. <u>Preliminary Conclusions as to Engineers' Reports</u>

We found the Morris and Blethen reports to be reasonable, reliable, and for the most part, consistent with respect to the feasibility of developing the subject property into a residential subdivision.  As explained more fully below, we accept the ultimate conclusion of each:  with respect to the Morris report, we accept that the subject property was developable into a 44-lot residential subdivision at a cost of approximately $2 million (without regard to extraordinary development costs).  With respect to the Blethen report, we accept that the aftereffects of earlier mining activity could be remediated to develop the property into a residential subdivision at a cost of approximately $110,000.

**[*47]**     3.     The Appraisers' Reports

          a.     The Holenstein Report

The Holenstein report, as submitted to the Court before trial, estimated the subject property's fair market value as $4.5 million on the valuation date on the basis of a highest and best use of residential development as a 59-lot subdivision.[22] During the concurrent testimony, after the engineers agreed that the subject property was possibly developable into 44-lot subdivision, a conclusion with which Mr. Holenstein came to agree, Mr. Holenstein revised his report to estimate the claimed fair market value of the subject property at $3,760,000 on the valuation date.[23] We summarize the Holenstein report as written, and note where appropriate the impact of Mr. Holenstein's acquiescence that the subject property

---

[22]Mr. Holenstein initially concluded the subject property was developable as a 59-lot subdivision because he erroneously understood the subdivision plan to be a fully engineered plan, meaning that the subdivision application complied with all regulations, planning guidelines, and engineering design criteria needed to obtain full and final approval. In reaching his conclusion, Mr. Holenstein initially relied upon a 2007 letter from Mr. Cilo, though he reduced his estimate of the number of developable lots when faced with the completeness review letter and contrary testimony offered concurrently by his peer experts.

[23]As discussed elsewhere in this opinion, Messrs. Morris and Blethen agreed further that developing the subject property into a 40-lot residential subdivision, as opposed to a 44-lot subdivision, would be more expeditious. To this point, Mr. Holenstein estimated the fair market value of the subject property as a 44-lot subdivision at $3,538,000.

[*48] was potentially developable into a 44-lot subdivision rather than a 59-lot subdivision.

As just mentioned, Mr. Holenstein regarded the highest and best use of the subject property as residential development of a 59-lot subdivision. In reaching his conclusion as to the property's highest and best use, Mr. Holenstein relied upon the proposed Irondale Manor plan submitted to the board in 1997 and conversations with Mr. Blethen concluding that mine remediation could be largely completed using materials native to the land. However, the Holenstein report did not account for costs associated with mine remediation so as to enable development of the property as a residential subdivision.

The Holenstein report used the market data approach to value the subject property. In this regard, Mr. Holenstein selected 34 purportedly comparable sales divided into two sets: the first set, comprising comparables 1 through 17, was sales of residential lots for which subdivision was not required; the second set, comprising comparables 18 through 34, was sales of raw land lots in which subdivision was intended. As to the first set of comparables, Mr. Holenstein performed a comparable sales analysis to understand the conceivable profit potential of a fully developed subject property. Mr. Holenstein adjusted each comparable in the first set for size, market conditions, location, and physical

**[\*49]** attributes, e.g., access, topography, and the presence of wetlands. Mr. Holenstein acknowledged at trial that the first set of comparables was irrelevant, though he noted that group did not contribute greatly to his opinion of value.[24] Accordingly, we set aside the first set of comparables in our analysis as they are not relevant to the issue of the subject property's fair market value.[25]

As to the second set of comparables, the group on which we focus our primary attention, Mr. Holenstein completed a comparable sales analysis of those properties and the subject property. Specifically, he adjusted each comparable for size, market conditions, location, and the presence or absence of approvals, e.g., the status of development approvals. He also applied the principle of diminishing returns, the premise that adding more units beyond a certain point (the point of diminishing returns) will result in lower per-unit returns. See Appraisal Institute, The Appraisal of Real Estate 40 (13th ed. 2008). The second set of comparables,

---

[24]We do not credit the Holenstein report's claim that the developed lots (i.e., comparables 1 through 17) and the undeveloped lots (i.e., comparables 18 through 34) were correlated to determine the final estimated value of $4.5 million. Mr. Holenstein testified at trial that the first set of comparables "doesn't make any great contribution to [his] final conclusion of value." Assuming a correlation was made as to the first and second set of comparables as the report suggests, we will infer from Mr. Holenstein's testimony that the correlation did little to the final conclusion of value.

[25]Petitioners' brief is consistent in that they do not discuss comparables 1 through 17 with any specificity.

[*50] and the adjustments imposed to derive an adjusted sale price for each, were as follows:

| No. | Sale date | Sale price | Units sold[1] | Price per unit | Market | Location | Density | Approvals | Adjusted sale price |
|---|---|---|---|---|---|---|---|---|---|
| 18 | 9/25/2003 | $585,000 | 5 | $117,000 | 7% | - | - | - | $124,924 |
| 19 | 3/1/2002 | 1,100,000 | 6 | 183,333 | 19% | (5%) | - | - | 207,836 |
| 20 | 5/14/2003 | 3,300,000 | 100 | 33,000 | 10% | - | 20% | - | 43,445 |
| 21 | 1/27/2005 | 8,500,000 | 156 | 54,487 | (4%) | - | 15% | - | 60,174 |
| 22 | 9/30/2002 | 1,200,000 | 15 | 80,000 | 15% | - | - | - | 91,730 |
| 23 | 3/2/2004 | 2,700,000 | 12 | 225,000 | 3% | - | - | (20%) | 185,918 |
| 24 | 7/27/2004 | 1,375,000 | 13 | 105,769 | - | (5%) | - | - | 100,547 |
| 25 | 3/12/2002 | 8,147,320 | 95 | 85,761 | 19% | - | - | (20%) | 81,707 |
| 26 | 4/29/2003 | 9,240,000 | 66 | 140,000 | 10% | - | (30%) | - | 107,838 |
| 27 | 8/20/2004 | 3,250,000 | [2]45 | 72,222 | - | - | - | - | 71,890 |
| 28 | 11/16/2005 | 1,700,000 | 5 | 340,000 | (10%) | (5%) | - | - | 289,443 |
| 29 | 1/17/2003 | 1,050,000 | 10 | 105,000 | 12% | - | - | - | 117,888 |
| 30 | 10/27/2003 | 1,200,000 | 6 | 200,000 | 6% | (5%) | - | - | 201,535 |
| 31 | 9/23/2004 | 1,600,000 | 9 | 177,778 | (1%) | (10%) | - | - | 158,071 |
| 32 | 12/8/2004 | 1,300,000 | 10 | 130,000 | 5% | (10%) | - | - | 123,026 |
| 33 | 7/3/2002 | 1,275,000 | 7 | 182,143 | 17% | (5%) | - | - | 201,783 |
| 34 | 12/19/2002 | 1,000,000 | 8 | 125,000 | 13% | - | - | - | 141,137 |
| Unadjusted mean | | | | 138,617 | | | | | 135,817 |

[1]We understand the reference to "units" to be to the number of developable lots.

[2]As discussed infra p. 77, the number of developable lots associated with comparable 27 was 60 lots and not 45 lots as stated in the Holenstein report. After adjusting the number of developable lots associated with comparable 27 from 45 lots to 60 lots and applying adjustments as determined by Mr. Holenstein, the adjusted sale price is reduced to approximately $54,167 ($3,250,000 sale price divided by 60 lots).

With respect to the market adjustment, the Holenstein report observed that the real estate market in 2004 was experiencing a sustained period of appreciation, and it noted that the contribution date occurred near the peak of market velocity. Mr. Holenstein adjusted the comparable sales, as appropriate, to compensate for

**[*51]** market differences between the contribution date and the date on which the comparable property was sold. For example, Mr. Holenstein determined that market adjustments were not necessary for comparables 24 and 27 because the sale of those properties was consummated in July 2004, the same month in which the subject property was sold to the county.

With respect to the location adjustment, the Holenstein report compared the proximity of each comparable to the subject property and adjusted the comparable sales in such a way as to neutralize the effects of convenience to services and commuter roadways, median home prices, general economics within the area, and overall market appeal. More specifically, the location adjustment was applied with regard for the conformity of subdivisions as compared with an isolated lot. As to the density adjustment, the Holenstein report deemed comparables that includes townhouses and condominiums to be inferior to the subject property, and as a result, adjusted the comparables upwards. As to the approvals adjustment, the Holenstein report noted that properties with full approvals tend to sell for a premium as compared with properties which have only preliminary approvals or approvals as of right.

The Holenstein report observed that the indicated value of comparables 18 through 34 reflected a range from $33,000 per lot to $340,000 per lot. Then, the

**[\*52]** Holenstein report used statistical modeling to derive a per-lot value equal to $76,953.[26] The Holenstein report next concludes that the fair market value of the subject property on the valuation date was $4,540,000, calculated as $76,953 per unit times 59 lots, rounded to the nearest thousand.

### b.    The Rinaldi Report

#### i.    Overview

The Rinaldi report presented two alternative valuation hypotheses:  a conservation premise and a development premise.  Under the former conservation premise, which indicated a market value of $660,000, Mr. Rinaldi performed a comparable sales analysis of vacant lands with a highest and best use of conservation.  Under the latter development premise, which indicated a market value of $1,510,000, Mr. Rinaldi completed a subdivision development analysis of the subject property to calculate the aggregate value of the individual lots with

---

[26]The Holenstein report's statistical model plotted the adjusted sale price of each comparable against its respective lot size and derived what we understand to be the diminishing rate of return indicated by a power curve, i.e., an exponential function with a power of -0.3585; the correlation, which represents how well a regression line fits a set of data, was stated to be of 83.7%.  The Holenstein report went on to use polynomial curve fitting to determine an indicated per-lot value equal to $76,953.  Precisely, the Holenstein report multiplied the per-lot value of $331,951 by the product of 59 lots raised to the -0.03585 power, or 0.231819, to interpolate (curve fit) the subject property's per-lot fair market value.  The indicated value per lot of $76,593 was calculated as $331,951 multiplied by 0.231819.

**[*53]** adjustments for hard and soft costs, the cost of approvals, the time to develop the site, and associated risks. We consider each premise in turn.

ii.     Development Premise

Mr. Rinaldi engaged Mr. Morris to perform an engineering viability analysis of the subject property; namely, the Morris report. Relying on the Morris report, Mr. Rinaldi estimated the market value of the subject property as if developing the parcel into a 44-lot subdivision were possible. However, this exercise was made futile by Mr. Rinaldi's predetermination that the prospect of developing the subject property was "highly speculative" because of the pending Highlands Act. He nonetheless completed a comparison of comparable sales of developed lots and adjusted the comparables for market conditions, time, size, physical factors, and approval status. He accounted for the sellout period, i.e., the time necessary to obtain approvals, improve the sites, and sell the individual lots. He forecasted revenues from the sales over the sellout period. He deducted from the revenue development and extraordinary costs as estimated in the Morris report. He applied a discount rate of 9% to the holding period to determine the final net present value of the subject property. The discount rate was calculated from the PwC Korpacz Real Estate Investor Survey (2d Quarter 2004), as well as other factors.

**[\*54]** Mr. Rinaldi selected six comparable sales in Morris County from June 2000 through May 2004, and he adjusted each comparable's value for market conditions, physical factors, size, and time required to obtain approvals, improve the site, and sell the individual lots (i.e., the sellout period). Each comparable sale was for a developed lot with approvals. Mr. Rinaldi then forecasted revenues from the sale of 44 lots, and he deducted from expected revenues extraordinary, but not ordinary, development costs. Mr. Rinaldi reasoned it was not necessary to subtract nonextraordinary development costs because the comparable finished lots already accounted for the cost of developing the subject property.

Mr. Rinaldi identified six claimed comparable sales, and he compared those properties to the subject property mostly on the basis of qualitative factors, such as convenience, demographics, size, and other physical features. Mr. Rinaldi ascribed to each comparable property subjective labels such as "similar," "superior", "inferior", "negative", and "positive". Specifically, the Rinaldi report compares the comparables to the subject property as follows:

| Sale | Year of sale | Number of lots | Price per lot | Location-convenience | Location-demographics | Size | Physical factors | Overall |
|------|--------------|----------------|---------------|----------------------|-----------------------|------|------------------|---------|
| 1 | 2000 | 108 | $62,222 | Similar | Superior | Negative | Similar | Similar |
| 2 | 2001 | 17 | 59,000 | Superior | Inferior | Positive | Superior | Superior |
| 3 | 2002 | 10 | 110,000 | Superior | Similar | Positive | Superior | Superior |
| 4 | 2002 | 84 | 48,214 | Similar | Superior | Negative | Superior | Superior |
| 5 | 2003 | 6 | 97,500 | Superior | Superior | Positive | Superior | Superior |
| 6 | 2004 | 110 | 66,818 | Similar | Superior | Negative | Inferior | Similar |

**[*55]** Mr. Rinaldi observed a range of $48,214 per lot to $110,000 per lot with an unweighted mean of $73,959 per lot and a median of $64,520 per lot. Mr. Rinaldi placed greater emphasis on comparables 1 and 6, properties he considered to be most similar to the subject property. On the basis of his analysis, which consisted of little more than we have summarized here, Mr. Rinaldi determined the unit lot value of the subject property to be no more than $80,000 per lot. The unit lot value assumed a hypothetical sale to a developer who would pay $2,025,684 to improve the subject property. As explained below, Mr. Rinaldi then accounted for various soft costs and extraordinary development costs associated with the subject property.

Mr. Rinaldi determined a five-year sellout period, three years for approvals and two years for site work and selling of the lots. He discounted over five years the value of the subject property using a discount rate of 9%. Mr. Rinaldi also deducted the following soft costs and extraordinary development costs:

| | |
|---|---|
| 1) Site plan approval, including engineering and/or legal expenses and municipality and/or county engineering review fees | $250,000 |
| 2) Permits and inspections, including performance bonds | 150,000 |
| 3) Extraordinary development costs | 556,510 |
| 4) Soft costs, including legal, accounting, consulting, and administrative fees | 79,200 |
| 5) Construction interest | 16,695 |

**[*56]** 6) Marketing, promotion, and brokerage fees      140,800
     7) Real estate taxes      105,000
     8) Developer's profit      528,000
     Total      1,826,205

Mr. Rinaldi concluded that the market value of the subject property under the subdivision development analysis was $1,510,000. He did not, however, adopt the value indicated under the development premise as his final estimate of value.

Mr. Rinaldi reasoned that whether the subject property could be subdivided was "highly speculative in view of the August 10, 2004, effective date of the Highlands Act and the uncertainty relative to the ultimate Highlands restrictions that are in addition to the [NJDEP] regulations existing as of the July 30, 2004, valuation date." Mr. Rinaldi explained that approvals had not been secured by the valuation date and, as he posited, were unlikely to be obtained because the Highlands Act was effective August 10, 2004. On the basis of his conclusion, which appears to have failed to appreciate that the subject property was in the planning area but not the preservation area, Mr. Rinaldi turned to his alternative conservation premises to ascertain the subject property's value as of the contribution date.

### iii. Conservation Premise

Under his primary conservation premise, Mr. Rinaldi concluded that the highest and best use of the subject property was partly for conservation and partly

**[\*57]** for development as three two-acre residential lots.  As to the six acres designated for development, Mr. Rinaldi estimated the market value of each two-acre lot to be $120,000; $360,000 in total.  Mr. Rinaldi calculated the value of each developable lot as the $80,000 unit lot value increased by 50% (an additional $40,000) because, as he concluded, there was no significant cost to develop the lots. As to the 59.64 acres designated for conservation, Mr. Rinaldi estimated the market value of those lots on the basis of 12 claimed comparable sales to be no more than $5,000 per acre, or approximately $300,000 in total.  Thus, adding the market values of the subject property under the development prong ($360,000) and the conservation prong ($300,000) indicated the subject property's market value under the alternative approach as $660,000.

c.      Preliminary Conclusions as to Appraisers' Reports

On brief, as with cross-examination, each party aims more to discredit the opposing party's appraiser than to prove the reliability and accuracy of their own expert appraiser.  Petitioners, citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 584-587 (1993), maintain Mr. Rinaldi failed to use a valid methodology to determine the subject property's fair market value.  Petitioners also claim that Mr. Rinaldi's analysis is result driven, resulting in an erroneous determination of the subject property's highest and best use and inconsistent testimony as to the

**[\*58]** effect of the Highlands Act on the fair market value of the subject property. Respondent, quoting Boltar, L.L.C. v. Commissioner, 136 T.C. at 336, asserts that the Holenstein report is "'so far beyond the realm of usefulness'" that we ought not consider it. We agree with both parties that the appraisers' reports are not wholly reliable, but we will not disavow in full the Holenstein report or the Rinaldi report because we find each helpful in its own right for determining the fair market value of the subject property.

At the outset, we note that the Rinaldi report is unreliable on its face in that it contains numerous computational errors. More importantly, the Rinaldi report is also empirically unsound in that it incorrectly applied the subdivision development approach to derive the market value of the subject property under the development premise, and used qualitative attributes when performing its market analysis. The Rinaldi report used the market data approach to estimate a per-lot market value of no more than $80,000. Mr. Rinaldi testified on cross-examination that the properties he selected as comparables were undeveloped lots with approvals rather than developed lots without approvals. After arriving at a value per undeveloped lot, Mr. Rinaldi subtracted the development costs and performed a discounted cashflow analysis to arrive at the "net present 'as is' land value." As discussed below, Mr. Rinaldi incorrectly reduced the value of an undeveloped lot by

**[\*59]** development costs rather than subtracting those costs from the value of a developed lot as required under the subdevelopment method of the income approach. As to the Holenstein report, it suffices to note here that it failed to take into account certain extraordinary costs not present in the comparables used in Mr. Holenstein's comparables analysis.

To be sure, the importance of concurrent testimony in these cases cannot be overstated; the experts' dialogue straightaway focused on the core issues in dispute, namely, the subject property's highest and best use, the impact of pending environmental legislation, and the role of preliminary and final approvals in comparable properties under the market approach. Additionally, the concurrent testimony elucidated shortcomings with the Rinaldi and Holenstein reports and resulted in the experts' reaching agreement as to at least two issues in dispute: the subject property's highest and best use and the number of developable lots to be included in a subdivision development analysis. Although we find the testimony of both Mr. Holenstein and Mr. Rinaldi helpful in understanding the facts relevant to the fair market value of the subject property, we decline to accept either expert's conclusion as to the subject property's fair market value because, as the concurrent testimony highlighted, each suffers from critical errors in analysis and application.

**[*60]** Accordingly, we shall reconstruct the subject property's fair market value aided by common sense, the experts' reports, and the benefit of their concurrent testimony.

V.     Valuation of the Subject Property and Critique of Experts' Reports

    A.     Measure of Value

The amount of a charitable contribution deduction under section 170(a) is generally equal to the fair market value of the property on the date of contribution. Sec. 1.170A-1(a), (c)(1), Income Tax Regs.  Fair market value has been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both and having reasonable knowledge of relevant facts.  United States v. Cartwright, 411 U.S. 546, 551 (1973); Bank One Corp. v. Commissioner, 120 T.C. 174, 304-306 (2003), aff'd in part, vacated in part and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006); see also sec. 1.170A-1(c)(2), Income Tax Regs.  The fair market value of the property to be valued reflects the highest and best use of the property on the valuation date.  Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.

[*61] Both the Rinaldi and Holenstein reports as first submitted to the Court applied a measure of value based on "market value" as defined by the Uniform Standards of Professional Appraisal Practice (USPAP).[27] Following our preliminary review of the appraisals before trial, we initiated a telephone conference with the parties during which we expressed concern that the Rinaldi and Holenstein reports each adopted market value, as opposed to fair market value, as their measure of value. Messrs. Holenstein and Rinaldi each submitted

---

[27]USPAP Advisory Opinion 22 (2008) defines market value as

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: 1. buyer and seller are typically motivated; 2. both parties are well informed or well advised and acting in what they consider their best interests; 3. a reasonable time is allowed for exposure in the open market; 4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and 5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

We have observed repeatedly that although market value adopts selective elements of fair market value, the two are not identical. See, e.g., Rothman v. Commissioner, T.C. Memo. 2012-163, 103 T.C.M. (CCH) 1864, 1873 (2012), vacated in part on reconsideration, T.C. Memo. 2012-218, 104 T.C.M. (CCH) 126 (2012); DiDonato v. Commissioner, T.C. Memo. 2011-153, 101 T.C.M. (CCH) 1739, 1741 n.8 (2011).

[*62] letters to the Court ostensibly for the purpose of clarifying the measure of value used. Mr. Holenstein, in his letter, compared the definition of market value as used in the Holenstein report with the definition of fair market value required under the regulations, and he detailed the reasons he believed his definition of market value "reasonably comports with the definitional requirements of" fair market value. Mr. Rinaldi, through his letter, directed the Court to substitute the term "fair market value" wherever in his report the term "market value" appeared. Despite his letter, Mr. Rinaldi maintained at trial that the difference between market value and fair market value is a "technical difference in the prose".

Under section 1.170A-1(a) and (c)(1), Income Tax Regs., our measure of value is fair market value. Market value, on the other hand, is an approximate value for fair market value, and the two terms are not necessarily synonymous depending on how they are defined and used. In these cases, we are satisfied that "market value", as defined and used in Mr. Holenstein's and Mr. Rinaldi's reports, is consistent with the term "fair market value" used in the regulations.

B.   Determination of Fair Market Value

1.   Approaches for Determining Fair Market Value

A determination of fair market value is a factual inquiry which requires the trier of fact to weigh relevant evidence and draw appropriate inferences as to the

[*63] value of the property in question.  See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Nat'l Grocery Co., 304 U.S. at 294; Symington v. Commissioner, 87 T.C. 892, 896 (1986).  Three approaches are generally employed to measure the fair market value of property:  the market approach, the asset-based approach, and the income approach.  Bank One Corp. v. Commissioner, 120 T.C. at 307.  The market approach values the subject property by comparing the property to similar properties sold in arm's-length transactions in or about the same period.  See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n. 24 (1987); Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19-20 (1979).  The comparable properties are adjusted to create parity between those properties and the subject property for comparative purposes.  The reliability of the market approach depends largely upon the comparables selected and the reasonableness of the adjustments made thereto.  Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 20.  Messrs. Holenstein and Rinaldi each employed the market approach to value the subject property.

The second valuation approach, the asset-based approach, generally values the subject property by determining the cost to reproduce it.  Bank One Corp. v. Commissioner, 120 T.C. at 307.  The experts testified at trial, and we agree, that

**[*64]** the asset-based approach is not a reliable approach for determining the fair market value of the subject property.

The final valuation approach, the income approach, determines the value of the subject property by capitalizing or discounting expected cashflows therefrom. Property value is determined under this approach by adding the sum of the present value of the expected cashflow and the present value of the residual value.  See id. The subdivision development method is a variation of the income approach previously recognized by this Court.  E.g., Consol. Investors Grp. v. Commissioner, T.C. Memo. 2009-290, 98 T.C.M. (CCH) 601 (2009); Glick v. Commissioner, T.C. Memo. 1997-65, 73 T.C.M. (CCH) 1925 (1997); Estate of McCormick v. Commissioner, T.C. Memo. 1995-371, 70 T.C.M. (CCH) 318 (1995).  The subdivision development method values undeveloped land by treating the property as if it were subdivided, developed, and sold.[28]  Consol. Investors

---

[28]The subdivision development method consists of six primary steps.  As the first step, the subject property's highest and best use is determined.  Second, the market approach is used to identify comparable finished (developed) lots and a per-lot value is derived.  Third, anticipated gross proceeds from the sale of the developed lots is calculated by multiplying the per-lot value by the total number of estimated finished lots.  Fourth, expected net proceeds are calculated by reducing the expected gross proceeds by direct and indirect costs and entrepreneurial profit.  Fifth, net sales proceeds are discounted to present value at a market-derived rate over the development and market absorption period.  Sixth, appropriate discounts for lack of marketability, partition, and market absorption are applied where

(continued...)

[*65] <u>Grp. v. Commissioner</u>, 98 T.C.M. (CCH) at 610 (citing <u>Glick v. Commissioner</u>, T.C. Memo. 1997-65). We now determine the subject property's fair market value.

    2.    <u>Determination of Highest and Best Use</u>

To decide how to best determine the fair market value of the subject property, we must first determine the subject property's highest and best use in addition to its then-current use. <u>Stanley Works & Subs. v. Commissioner</u>, 87 T.C. at 400; sec. 1.170A-14(h)(3)(ii), Income Tax Regs. The highest and best use of the subject property is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. <u>Olson v. United States</u>, 292 U.S. 246, 255 (1934); <u>see also</u> <u>Hilborn v. Commissioner</u>, 85 T.C. 677, 689 (1985). The highest and best use of property can be any realistic, objective potential use of the property. <u>Symington v. Commissioner</u>, 87 T.C. at 896. Subsequent events are generally not considered in determining fair market value, <u>Ithaca Trust Co. v. United States</u>, 279 U.S. 151, 155 (1929), though they may be considered to the extent reasonably foreseeable on the valuation date, <u>Estate of</u>

---

²⁸(...continued)
appropriate. The resulting figure equals the indicated value of the undeveloped land. <u>See generally</u> Appraisal Institute, The Appraisal of Real Estate 370-376 (13th ed. 2008).

**[*66]** <u>Gilford v. Commissioner</u>, 88 T.C. 38, 52 (1987); <u>see also</u> <u>Trout Ranch, LLC v. Commissioner</u>, ___ Fed. Appx. at ___, 2012 WL 3518564, at *7; <u>Okerlund v. United States</u>, 365 F.3d 1044, 1051-1053 (Fed. Cir. 2004); <u>Saltzman v. Commissioner</u>, 131 F.3d 87, 93 (2d Cir. 1997), <u>rev'g</u> T.C. Memo. 1994-641, 68 T.C.M. (CCH) 1544 (1994); <u>Trust Servs. of Am., Inc. v. United States</u>, 885 F.2d 561, 569 (9th Cir. 1989); <u>Estate of Sachs v. Commissioner</u>, 856 F.2d 1158, 1160 (8th Cir. 1988), <u>rev'g</u> 88 T.C. 769 (1987); <u>First Nat'l Bank of Kenosha v. United States</u>, 763 F.2d 891, 893-894 (7th Cir. 1985); <u>Morris v. Commissioner</u>, 761 F.2d 1195, 1201 (6th Cir. 1985), <u>aff'g</u>, T.C. Memo. 1982-508, 44 T.C.M. (CCH) 1036 (1982).

Petitioners contend that the highest and best use of the subject property was for residential development as a 44-lot subdivision, proffering a fair market value of $3,761,000. Respondent disagrees, maintaining that the highest and best use of the subject property was part conservation and part development as three two-acre residential lots, yielding a market value of $660,000. At trial, three experts-- namely, Messrs. Morris, Blethen, and Holenstein--agreed that the highest and best use of the subject property was for residential development as a 44-lot subdivision. Mr. Rinaldi, on the other hand, maintained that the subject property's highest and best use was for conservation. Fundamental to respondent's and Mr. Rinaldi's

[*67] determination that the highest and best use of the subject property was for conservation is, according to them, that the prospects for developing the subject property were "highly speculative" because of environmental legislation which had passed the New Jersey State legislature before the valuation date and was enacted into law less than two weeks after the valuation date.

We decline to conclude that residential subdivision of the subject property in 2004 was highly speculative. The U.S. Census Bureau consistently ranks New Jersey as the most densely populated State in the Union.[29] See U.S. Census Bureau, Statistical Abstract of the United States: 2009, at 18 (128th ed. 2008). In this context, Governor James McGreevy issued Executive Order No. 4 declaring it the law and policy of the State of New Jersey to promote smart growth and to reduce the negative effects of sprawl. See Exec. Order No. 4 (Jan. 31, 2002), available at http://nj.gov/info bank/circular/eoindex.htm. The New Jersey legislature shortly thereafter adopted a "smart growth" strategy aimed at allowing for well-planned and well-managed development to meet the economic needs of

---

[29]New Jersey accounts for 8,214 square miles of the United States' total 3.5 million square miles, making it the fifth-smallest State geographically. National Atlas of the United States, available at http://nationalatlas.gov/articles/mapping/a_general.html. At the same time, New Jersey has consistently, since at least 1980, had between the 9th- and 11th-highest populations of any State. U.S. Census Bureau, Statistical Abstract of the United States: 2009, at 18 (128th ed. 2008).

[*68] its residents, while at the same time preserving open space, farmland, and environmental resources.  See Robert S. Goldsmith, "What Will Happen to Redevelopment in New Jersey When the Economy Recovers?", 36 Rutgers L. Rec. 314, 314, 323-324 (2009) (surveying New Jersey's efforts over the past 20 years to limit development within the State); see also N.J. Stat. Ann. sec. 52:18A-196 (West 2010).[30]

To further New Jersey's commitment to preservation, on September 19, 2003, Governor McGreevy issued Executive Order No. 70 establishing the Highlands Task Force to make recommendations intended to preserve natural resources of and enhance the qualify of life in the New Jersey Highlands region, a portion of the national Highlands region covering roughly 800,000 acres in 88 municipalities and all or part of 17 counties.  See Exec. Order No. 70 (Sept. 19, 2003), available at http://nj.gov/infobank/circular/eoindex.htm.  On June 7, 2004, the New Jersey legislature passed the Highlands Water Protection and Planning Act (Highlands Act), 2004 N.J. Sess. Law Serv. Ch. 120 (West), reenacted as N.J. Stat. Ann. secs. 13:20-1 to 13:20-35 (West Supp. 2012).

---

[30]Although the New Jersey statute enacting the smart growth policies was not enacted until 2004, we think it reasonable to conclude that passage of this act was not surprising given Governor McGreevy's executive order on the matter.

**[*69]** The Highlands Act was signed into law on August 10, 2004, less than two weeks after the contribution date. Id. The Highlands Act reflected the New Jersey legislature's findings that the New Jersey Highlands were an essential source of drinking water, providing drinking water to approximately one-half of the State's residents and a keeper of exceptional natural resources such as clean air, forest lands, wetlands, pristine watersheds, and habitat for animals and vegetation. See N.J. Stat. Ann. sec. 13:20-2. The New Jersey legislature also found that the New Jersey Highlands, because of their proximity to rapidly expanding suburban areas, was at serious risk of being fragmented and consumed by development. Id. The Highlands Act also divided by a metes and bounds description two areas within the Highlands region: (1) the preservation area of the Highlands Region, see id. sec. 13:20-7(b), and (2) the planning area of the Highlands Region, see id. sec. 13:20-7(c) and (d).[31] The subject property was within the planning area but not the preservation area (i.e., the Highlands Act land was not immediately subject to the regulations). By the end of 2003 and throughout 2004, the boundaries of the

---

[31]Development in the preservation area was mandatory and strictly regulated, while development within the planning area was discretionary and recommended. See, e.g., N.J. Stat. Ann. sec. 13:20-10(b) and (c). The Highlands Act, however, set specific goals with respect to the planning area, including to identify undeveloped areas in the planning area that were not significantly constrained by environmental limits that could be developed. See id. sec. 13:20-11a.(6).

**[\*70]** preservation area were uncertain and many developers routinely questioned the impact of expected changes to land use regulations on development sites. The New Jersey Department of Environmental Protection (NJDEP) adopted rules protecting the Highlands region on May 9, 2005. See N.J. Admin. Code secs. 7:38-1.1 to 7:38-14.2 (2006).

Respondent contends that development of the subject property was highly speculative because of the presence of wetlands, a protected stream, and a habitat for an endangered species, as well as the enactment of the Highlands Act that was "common knowledge" to participants in the real estate market. We are not persuaded that any of these circumstances limits the highest and best use of the subject property to conservation. As to the presence of wetlands and Granney Brook, Messrs. Morris, Blethen, and Holenstein agreed on concurrent examination that the watercourses did not per se prohibit development of the subject property. Rather, the three experts agreed that the presence of the wetlands and Granney Brook would reduce the number of developable lots from 59 to, at most, 44. We credit as reasonable and reliable the concurrence between these experts, one of

**[*71]** whom testified on behalf of respondent (Mr. Morris) and two of whom testified on behalf of petitioners (Messrs. Blethen and Holenstein).[32]

Nor do we accept respondent's uncorroborated allegation on brief that an allegedly endangered wood turtle species habitated the subject property. Although CEI's 1997 EIS noted the presence of the wood turtle on the subject property, we reject respondent's position that the wood turtle was endangered in 2004 or at any other relevant time. New Jersey administrative law recognized the wood turtle as a threatened species in 2003 but not an endangered species. N.J. Admin. Code sec. 7:7A, app. 1 (2003). Classification of the wood turtle as a threatened species means the reptile was at risk of becoming endangered if conditions surrounding it began to or continued to deteriorate. Id. sec. 7:25-4.1 (2001). Risk of extinction is not tantamount to being extinct. Respondent has not established the effect, if any, that a threatened but not endangered species might have on the value of the subject property.

Finally, we reject respondent's position that the Highlands Act made development of the subject property highly speculative. The subject property, by

---

[32]As further evidence that the wetlands and Granney Brook stream did not affect the developability of the subject property, we observe that the Holenstein report noted that a nearby residential subdivision, Harvest Run, was developed during the late 1990s and shared stream constraints similar to those the subject property faced.

[*72] virtue of its situs in the planning area but not the preservation area, was not certain to have development restrictions imposed under the Highlands Act. Rather, we regard New Jersey's "smart growth" policy as supporting the proposition that in 2004 development of the subject property was at least equally likely as its preservation. We also refuse to conclude that the development of the subject property was highly speculative in view of the fact that the township, described by one of its executives as limited in financial resources, would have been required to incur soft costs to preserve the subject property for open spaces if, as respondent intimates, it was a foregone conclusion that the subject property was undevelopable. Nor do we believe the county would have paid $1.5 million to preserve the subject property if that property was indubitably protected by the Highlands Act. Whereas petitioners argue on brief that the effect of the Highlands Act (if any) was to increase the subject property's value, we reject that proposition because petitioners have failed to quantify the increase, assuming one existed. On the basis of the foregoing, we conclude that the highest and best use of the subject property was for residential development as a 44-lot subdivision.

### 3. Mr. Holenstein's Comparable Sales Analysis

Having concluded the highest and best use of the subject property was for residential development, we reject Mr. Rinaldi's conservation premise in his report

**[\*73]** which valued the property at $660,000. We also note respondent is deemed

to have waived Mr. Rinaldi's development premise, which valued the subject

property at $1,510,000. See supra note 18. In any event we find the assumptions of

Mr. Rinaldi's development premise unreliable. The Rinaldi report used the market

data approach to arrive at an estimated per-lot market value of no more than

$80,000. Mr. Rinaldi testified on cross-examination, however, that the properties

he selected as comparables were undeveloped lots with approvals rather than

developed lots with approvals. In a manner similar to the subdivision development

valuation method, Mr. Rinaldi, after having arrived at a value per undeveloped lot,

subtracted development costs and performed a discounted cashflow analysis to

derive the "net present 'as is' land value." We decline to rely on the values for

undeveloped lots proffered in the Rinaldi report because under the subdivision

development analysis we look to developed lots of comparable properties, not

undeveloped lots. Accord Consol. Investors Grp. v. Commissioner, 98 T.C.M.

(CCH) at 610; Appraisal Institute, supra, at 370.

As to the Holenstein report, we find petitioners have met their burden to

prove the soundness of Mr. Holenstein's comparable sales analysis although we

believe it requires further adjustments. Mr. Holenstein testified during the

concurrent testimony phase of the trial that comparables 1 through 17 are

**[\*74]** irrelevant when determining the fair market value of the subject property; we agree. Each of those properties was a residential lot, i.e., one with a house built thereon, rather than merely a developed lot with the required infrastructure for building residential lots, e.g., roadways, utilities, etc. In this sense, comparables 1 through 17 are irrelevant to the subdivision development analysis.

Using comparables 18 through 34, Mr. Holenstein developed a statistical model using polynomial regression to correlate a relationship between the number of lots into which an undeveloped parcel of land may be subdivided and the sale price per lot. The regression analysis shows a relationship of a diminishing rate of return. The relationship, expressed in the form of a statistical formula, see supra note 26, allows us to determine how much the subject property which can be subdivided into 44 lots is worth. Respondent does not challenge Mr. Holenstein's statistical modeling and the model's assumption of "diminished returns"; nor did Mr. Rinaldi during the concurrent testimony phase of the trial. We are persuaded that we may rely at least in part on Mr. Holenstein's model to arrive at the subject property's fair market value as of the valuation date.

4.  Respondent's Challenges to the True Comparability of Comparables 18 Through 34

While not questioning the statistical model itself, respondent challenges only the data points used in the model by asserting that many of the properties

**[\*75]** among comparables 18 through 34 are not comparable to the subject property.

Respondent argues comparable 20 is not comparable to the subject property

because, unlike the subject property which is in the Highlands Act planning area,

comparable 20 is within the Highlands Act preservation area.[33] While comparable

20 may not be a true comparable, examining the model's power curve leads us to

conclude that the inclusion of comparable 20 has not materially affected the

correlation determined by Mr. Holenstein's model. Indeed, even if one were to take

comparable 20 out of the 17 comparables used in Mr. Holenstein's statistical model,

the only effect of doing so is a slight upward adjustment of the power curve--i.e., the

per-unit sale price as a function of the number of subdivided units would go up. In

other words, the inclusion of comparable 20 works in respondent's favor by

bringing down Mr. Holenstein's approximation of the subject property's value. This

does not surprise one's common sense since including a property situated in the

preservation area would be expected to depress the model's valuation of the subject

property.

Respondent also contends comparables 18, 19, 22, 23, 24, and 28 through

34 are not true comparables because they involved significantly fewer lots than

---

[33]Comparable 20 was determined to be undevelopable by virtue of its situs in the Highlands Act preservation area.

**[\*76]** proposed under the 44-lot subject property. Respondent's contention misses the point. The benefit of a regression analysis is its ability to draw a wider range of data to produce a better approximation of the dependent valuable (i.e., the per-unit price) as a function of the independent variable (i.e., the total number of units). Thus having a large set of data across a spectrum is what makes Mr. Holenstein's statistical model a better model than, for example, an unweighted averaging of a limited number of "true comparables". Indeed, attacking the comparability of Mr. Holenstein's data without challenging the modeling itself showcases respondent's lack of full appreciation of Mr. Holenstein's regression analysis.

Respondent further contends comparables 23 and 28 through 34 are not valid comparables for other reasons--comparables 23 and 34 did not require improvements because they were essentially subdivisions on an existing street, and comparables 28 through 33 required simple extensions and improvements. As the model's power curve clearly shows, comparables 23 and 28 through 34 belong to a very narrow range of data that represents comparables at the far end of the spectrum, i.e., parcels of land that can be subdivided into 5 to 12 units. Within this range are also comparables 18, 19, 22, and 24, and respondent does not argue they are not true comparables because they did not require improvements or that

**[*77]** they required little improvement. Thus in terms of the level of improvement required, this latter set of comparables (18, 19, 22, 24) are true comparables of the subject property. Consequently we are persuaded that this latter set of comparables has sufficiently offset or at least mitigated any distortion or statistical noise that the outliers, i.e., comparables 23 and 28 through 34, might have introduced--due to their being more developed parcels compared to the subject property--into the overall model.[34]

As to comparable 27, pages 40 and 81 of the Holenstein report inconsistently state the number of approved lots as 45 and 60, respectively. Petitioners acknowledge this discrepancy in their reply brief when they state the number of developable lots associated with comparable 27 is "irrelevant" in that "it does not change the fair market value determination significantly." The record and specifically the power curve of Mr. Holenstein's model support that conclusion.

---

[34]We are not even certain if any statistical noise attributable to the level of required improvement of a particular property would materially alter the correlation reached in the Holenstein report. For example, comparable 18 (undeveloped) has six units with an adjusted per-unit price of $207,836, whereas comparable 30 (only simple improvement needed) with also six units has a less adjusted per-unit price of $201,535.

**[*78]** Respondent also takes issue with the 20% adjustment Mr. Holenstein makes to comparables 23 and 25 because each of those properties was sold with approvals. We do not share respondent's distrust of these adjustments. The adjustments were unchallenged in the concurrent testimony process, and we accept the adjustments as reasonable and reliable.

Respondent finally argues that comparables 18 through 34 are not valid comparables of the subject property because each of the sales reflected properties sold subject to preliminary approvals or with approvals of right, whereas the subject property had no approvals. We disagree.

New Jersey law allows a developer, such as petitioner, to apply for major subdivision approval.[35] N.J. Stat. Ann. sec. 40:55D-48b. Approval is required at both the county and municipal levels. See id. secs. 40:55D-37, 40:27-6.3. As to an application for preliminary approval, New Jersey law requires municipalities to grant preliminary approval if the proposed subdivision complies with adopted ordinances and the Municipal Land Use Law. See id. sec. 40:55D-48b. county review of a subdivision application is limited to the effect of the proposed developments on county roads and drainage facilities. Pizzo Mantin Grp. v. Twp.

---

[35]The term "developer" is defined to include the legal or beneficial owner or owners of a lot of any land proposed to be included in a proposed development. N.J. Stat. Ann. sec. 40:55D-4.

**[\*79]** of Randolph, 645 A.2d 89, 94-95 (N.J. 1994); see Manalapan Holding Co. Inc. v. Planning Bd. of Hamilton, 457 A.2d 441, 443, 445-446 (N.J. 1983) (citing N.J. Stat. Ann. sec. 40:27-6.3).  With respect to an application for final approval, New Jersey law requires the developer to establish that the application conforms to all ordinance requirements for final approval, to all conditions set forth in the preliminary approval, and in the case of a major subdivision, to the standards as delineated in the Map Filing Law (i.e., that the approved plat is acceptable for filing with the county recording officer).  See N.J. Stat. Ann. sec. 40:55D-50a.  Once preliminary approval is obtained, final approval of the subdivision plan should be a relatively simple procedure.  See 36 N.J. Prac. Land Use Law, sec. 17.13 (3d ed. 2012) (available on Westlaw).

Applying the foregoing to these cases, we are persuaded that approvals could be secured for the subject property with a price tag.  The completeness review letter detailed about 65 defects with the Irondale Manor plan needing to be fixed before preliminary approvals could be granted; i.e., before the plan complied with applicable ordinance and land use law requirements.  The experts, except for Mr. Rinaldi, agreed it was feasible to develop the subject property into a subdivision of 44 lots.  Neither respondent nor the experts noted any defect in the Irondale Manor plan (beyond those stated in the completeness review letter) to

[*80] suggest the plan did not comply with applicable ordinances and land use law. Thus, we conclude the issue of approvals is inconsequential to the developability of the subject property in that it could be done, albeit at a cost. As to comparables 18 through 34 in the Holenstein report, they are also undeveloped property but subject to approvals, which according to Mr. Holenstein's credible testimony during the concurrent expert testimony phase of the trial means the buyers in negotiating the sale price would have already factored in all ordinary development costs, including time value of money, necessary to obtain approvals. As a corollary, properties subject to approvals for our purpose are comparables of the subject property without approvals.

### 5. Preliminary Value of Subject Property Under Mr. Holenstein's Model

We have concluded that the highest and best use of the subject property was for residential development as a 44-lot subdivision. We have also concluded that Mr. Holenstein's statistical analysis of comparable sales is fundamentally sound and that petitioners have been able to show the comparables used in Mr. Holenstein's analysis are appropriate and fit. Using Mr. Holenstein's statistical formula, the per-lot value is $85,486 on the valuation date. Thus, we find that the preliminary value of the subject property is $3,761,000 on the valuation date, calculated as 44 lots times $85,486 per lot.

**[\*81]**      6.      <u>Extraordinary Development Costs and Inspection Fees</u>

While we generally accept Mr. Holenstein's comparable sales analysis, we believe it also needs certain adjustments for extraordinary costs not present in the comparables.[36]  Respondent's engineering expert, Mr. Morris, determined total construction costs associated with the subject property as $2,582,194, including $556,510 of extraordinary costs.  Petitioner's engineering expert, Mr. Blethen, determined total construction costs to range between $2 million and $2.2 million, with no allowance for extraordinary costs.  Mr. Morris, pursuant to N.J. Stat. Ann. secs. 40:55D-53.2 and 40-55D-53h., also made an allowance for inspection fees related to the development of the subject property calculated as 5% of the total construction costs.  Mr. Morris calculated the inspection fees to be $107,591, though we note that 5% of $2,582,194 is $129,110, and not $107,591 as he determined.

As to the extraordinary costs, Mr. Morris deemed it appropriate to include these costs in the development cost of the subject property because, he determined,

---

[36]As Mr. Holenstein points out in his report, the comparables are undeveloped properties subject to approvals, which means the hypothetical developer-buyer would have already factored in ordinary development costs in negotiating the sale prices.  Appropriately then in our adjustment of Mr. Holenstein's valuation model, we need not account for the ordinary development costs as they are already present in the comparables' sale prices.

**[*82]** the subject property required extensive site development by virtue of its environmental characteristics and steep slopes. He calculated the total extraordinary development costs as follows: $325,770 of offsite construction costs related to the Irondale Manor plan, $122,740 of offsite construction costs as a result of the completeness review letter, and $108,000 for retaining walls. We consider Mr. Morris' estimates of extraordinary costs reasonable in view of the topography of the subject property and the slope of Iron Mountain and we accept it. Mr. Blethen and Mr. Holenstein did not explain their decision not to include extraordinary costs as development costs, and without reasoned analysis, we are not persuaded. Accordingly, we conclude that there are extraordinary costs of $556,510 associated with developing the subject property not included in the comparable sales analysis.

We agree with Mr. Morris' decision to make an allowance for inspection fees equal to 5% of the total construction costs. See id. Mr. Blethen, though he did not specifically address the inspection fees issue, states in his rebuttal report that he generally concurs with Mr. Morris' estimates. Construing Mr. Blethen's acquiescence to also conclude the inspection fees, we understand the parties to agree that such an adjustment is proper. In view of the foregoing, we conclude that an allowance for inspection fees equal to 5% of the construction costs, or

**[\*83]** $129,110, is appropriate in figuring the development costs for the subject property.

Mr. Blethen testified on direct that shaft number 1 of the Scrub Oaks mine had been sealed incorrectly, and he identified that mine as a critical hazard of the subject property because of its presence in the middle of the subject property over which a road was to be installed. Mr. Blethen testified that the cost to rededicate (i.e., fill and seal) this particular mine shaft was $30,000, and that the cost to fill the remaining mine depressions was approximately $80,000. We credit Mr. Blethen's cost estimate to remediate the mine as reasonable and reliable and we accept it. Accordingly, we adjust the fair market value of the subject property for $110,000 as a remediation cost associated with the mines on the subject property.

In sum, we find the value of the subject property is $2,965,840, determined as follows :

|   | | |
|---|---|---|
|   | Number of lots | 44 |
| x | Fair market value per lot | $85,486 |
| = | Modified gross value | 3,761,460 |
| - | Extraordinary costs | (556,510) |
| - | Mine remediation costs | (110,000) |
| - | Inspection fees | (129,110) |
| = | Net proceeds | 2,965,840 |

[*84] VI.    Substantiation Requirements of Section 170

Petitioners maintain that they have satisfied the substantiation requirements of section 170.  Specifically, they argue the August 16 letter substantiated their charitable contribution as a contemporaneous written acknowledgment required by section 170(f)(8).  Petitioners further contend that they had obtained a qualified appraisal required by section 170(f)(11) and that even if the appraisal they obtained did not meet the literal requirements of section 170(f)(11) and the regulations thereunder, it substantially complied with such requirements.  Finally, petitioners ask that any noncompliance with respect to the qualified appraisal requirement be excused on the ground of their showing of reasonable cause.

A.    Contemporaneous Written Acknowledgment

Section 170(f)(8) requires a taxpayer to substantiate any claimed deduction for a charitable contribution of $250 or more with a contemporaneous written acknowledgment from the donee.  Sec. 170(f)(8)(A).  The contemporaneous written acknowledgment may take any form but must include (1) the amount of cash and a description (but not value) of any property other than cash contributed; (2) whether the donee provided any goods or services in consideration, in whole or in part, for the property the donor contributed; and (3) if the donee provided any goods or services, a description and a good-faith estimate of the value of the goods

[*85] or services provided as part of the quid pro quo contribution. Sec. 170(f)(8)(B); Schrimsher v. Commissioner, T.C. Memo. 2011-71, 101 T.C.M. (CCH) 1329, 1330 (2011). We have held that the doctrine of substantial compliance does not apply to excuse a failure to comply with the requirements of section 170(f)(8)(B) because they are more than merely procedural requirements but rather go to the heart of the statute's purpose. See Averyt v. Commissioner, T.C. Memo. 2012-198, slip op. at 10; Durden v. Commissioner, T.C. Memo. 2012-140, 103 T.C.M. (CCH) 1762, 1763-1764 (2012). The contemporaneousness of the written acknowledgment is not at issue here. See generally sec. 170(f)(8)(C).

Respondent argues that the August 16 letter did not satisfy the contemporaneous written acknowledgment requirements in several ways. First, respondent believes the letter was defective because it was not signed by the county that was the purported donee. Respondent further contends that the letter incorrectly described a part of the contributed property as "Block 703, Lot 12" as opposed to block 702, lot 12. Respondent also found the August 16 letter defective because "the letter did not include a statement as to whether the donee provided any goods or services in consideration, in whole or in part, for the property contributed." Respondent is mistaken in all counts.

**[\*86]**     1.     <u>Mr. Lewis May Provide the Acknowledgment on Behalf of Grantee</u>

An agent of the donee may provide the contemporaneous written acknowledgment to the donor.  Rev. Rul. 2002-67, 2002-2 C.B. 873.  The determination of whether a valid agency relationship exists is governed by State law.  <u>Id.</u>  Under New Jersey law, an agency relationship may be created through actual authority or apparent authority.  <u>N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co.</u>, 1 A.3d 632, 639 (N.J. 2010).  The Supreme Court of New Jersey explains:

> Actual authority occurs when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.  Apparent authority arises when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.  The doctrine of apparent authority focuses on the reasonable expectations of third parties with whom an agent deals.

<u>Id.</u> (internal quotations and citations omitted).

There is ample evidence in the record to show that Mr. Lewis in facilitating the bargain purchase had acted as the agent of the preservation partnership with actual and apparent authority.  When the township was unable to purchase the subject property through the contemplated bargain sale on account of financial constraints, Mr. Lewis as the township's administrator identified MCMUA and the

[*87] conservancy as alternative funding sources and precipitated the formation of the preservation partnership. In the discussions that followed, Mr. Lewis remained the frontman of the preservation partnership. Mr. Lewis represented the preservation partnership during a township board meeting on May 25, 2004, to inform the board that the preservation partnership had entered into a land sale agreement with the Crimis and Concrete for the dedication of the open space. He also signed and provided the August 16 letter on the township's letterhead "[o]n behalf of the MCMUA, the Morris Land Conservancy, and the Township of Mine Hill and its residents." The letter was "carbon copied" to Glenn Schweizer, the executive director of the MCMUA, and David Epstein of Morris Land Conservancy. Mr. Lewis also signed the Forms 8283 on behalf of the preservation partnership. In the light of these facts, it was more than reasonable for petitioners to rely on Mr. Lewis' apparent authority to act on behalf of the preservation partnership, and the belief that Mr. Lewis had such authority was certainly traceable to the partnership's manifestations. We also believe that Mr. Lewis was within his actual authority to act because he could reasonably believe his principal--the preservation partnership--wished him to act in the manner he did when his actions would create legal consequences to the members of the partnership.

[*88] The record also shows that MCMUA, as a partner of the preservation partnership, was engaging in the transaction on behalf of the county, which was the grantee of the subject property. The board members of MCMUA are appointed by the board of the freeholders of the county and thus an extension of the county. In a letter dated July 24, 2003, that Mr. Schweizer wrote to Mr. Crimi on MCMUA's letterhead, Mr. Schweizer informed Mr. Crimi that the county's Open Space Trust Fund would be primarily responsible for funding the bargain purchase and that "county representatives, including county Counsel's Office, are involved in the details of all such transactions. Ultimately, final approval of any deal must come from the Board of Freeholders." The contract of sale that the county eventually entered into in October 2003 with the Crimis and Concrete clearly stated the sale was made subject to a perpetual easement in favor of MCMUA for the conservation of the open space and the transfer to MCMUA in perpetuity of certain water and land rights. Thus, it is clear from the evidence that the county had approved the acquisition of the subject property and had actually acquired it to allow the preservation partnership to protect the acquired open space. The terms of the sale contract allow a strong inference that while the county was intended to become the titleholder of the subject property, the actual conservation efforts were to be delegated to MCMUA. Indeed, we believe the

[*89] county had always intended to delegate such responsibility to MCMUA from the beginning of the negotiation.

Thus the evidence supports our conclusion that under either the actual authority premise or the apparent authority premise, MCMUA was acting on behalf of the county in an agency capacity. The preservation partnership represented the interest of the county throughout the negotiation over the bargain purchase of the subject property. Looking at the transaction as a whole and its history, it was reasonable for a third party to conclude the preservation partnership had at least the apparent authority to act on the county's behalf because a reasonable person would believe that its partner, MCMUA, had apparent authority to act on behalf of the county and that belief was traceable to the county's manifestations evidenced by the county's provision of most of the funds to finance the bargain purchase, its intent to permit MCMUA to preserve the dedicated open space, and its relationship with MCMUA. For the same reasons, we also believe MCMUA had the actual authority to negotiate the terms of the purchase and eventually consummate the transaction. Our conclusion is bolstered by the fact that MCMUA's board members were officials appointed by the county's freeholders, who approved the transaction.

**[*90]** Thus, because an agency relationship can be traced from Mr. Lewis through MCMUA to the county, we find the August 16 letter was one provided by an agent authorized to act by the county within the agent's apparent and actual authority. See Rev. Rul. 2002-67, supra.

2.  The August 16 letter's Inaccurate Description of the Contributed Property

Section 170(f)(8)(B)(i) requires the written acknowledgment to provide a description of the contributed property. Neither the statue nor the regulations tell us what may constitute a sufficient description. The legislative history explains the written acknowledgment requirement is to cause a taxpayer claiming a charitable contribution to obtain from the donee organization receiving a quid pro quo contribution (e.g., a part-gift, part-sale transaction) information regarding the extent to which the contribution is deductible. H.R. Rept. No. 103-111, at 785-786 (1993), 1993-3 C.B. 167, 361-362. Thus it is apparent that the purpose of the description requirement of section 170(f)(8)(B)(i), similar to the same requirement under section 170(f)(11) relating to a qualified appraisal, is to ensure sufficient information is provided to the Commissioner to evaluate the quid pro quo contribution. See Kaufman v. Commissioner, 687 F.3d 21, 29 (1st Cir. 2012), vacating in part 134 T.C. 182 (2010).

[*91] In that regard, the regulations under section 170(f)(11) are particularly enlightening:  a description of a contributed property is sufficient for purposes of a qualified appraisal if it provides "sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed".  Sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs.  Appropriately a description of a contributed property in a written acknowledgment required by section 170(f)(8) must also provide sufficient detail so that the Commissioner not familiar with the type of property may ascertain the property described is the property contributed.

We are satisfied that the August 16 letter provided a sufficient description of the contributed property to ensure respondent would know the property described in the letter was the property contributed.  The description at issue misstated the block/lot of the contributed property as "Block 703 Lot 12" when it was supposed to be "Block 702 Lot 12".  What is essentially a small typographical error should not prevent respondent from being able to recognize the property acknowledged to have been received by the county was actually "Block 702 Lot 12", especially in the light of the fact that the 2000 appraisal and the Form 8283 attached to the Crimis' 2004 return provided the accurate description of the contributed property.  Cf. Friedman v. Commissioner, T.C. Memo. 2010-45, 99

[*92] T.C.M. (CCH) 1175, 1178 (2010) (Form 8283 is not a written acknowledgment under section 170(8)(f) because it does not contain the statement required by section 170(8)(f)(B)(ii)).  Even a cursory examination of the Crimis' 2004 return and its attachments would allow respondent to immediately realize that the block/lot description in the August 16 letter was a typographical error and the property received by the donee was in fact block 702 lot 12.  See Scheidelman v. Commissioner, 682 F.3d 189, 198-199 (2d Cir. 2012) (finding doctrine of substantial compliance may excuse technical deficiency when required information and required signature was dispersed in two forms submitted together), vacating and remanding T.C. Memo. 2010-151, 100 T.C.M. (CCH) 24 (2010).  We find the August 16 letter meets the description requirement of section 170(f)(8).

   3. The August 16 Letter Stated the Consideration Provided

Section 170(f)(8)(B)(ii) and (iii) requires the written acknowledgment contain a statement whether the donee organization provided any goods or services in consideration, in whole or in part, for the contributed party, and if so a description and good faith estimate of the value of the consideration provided.  If the donee did not provide any consideration for the contributed property, the written acknowledgment must say so.  Schrimsher v. Commissioner, 101 T.C.M.

**[\*93]** (CCH) at 1331.  As we stated earlier, the purpose of section 170(f)(8) is to cause a taxpayer donor in a quid pro quo contribution, such as a part-gift, part-sale transaction, to acquire a statement from the donee organization that can substantiate the deductible portion of the contribution.  H.R. Rept. No. 103-111, supra at 785-786, 1993-3 C.B. at 361-362.

The August 16 letter meets the literal requirements of section 170(f)(8)(B)(ii) and (iii) and serves the statutory purpose.  The letter stated that the preservation partnership received the contributed property[37] valued at $2,950,000, in consideration for which the county provided a cash consideration of $1,550,000, leaving a charitable contribution of $1.4 million.  Respondent seems to suggest that this was insufficient because it failed to say whether the donee organization provided other goods, services, or valuable consideration.[38]  We disagree.  In Schrimscher v. Commissioner, 101 T.C.M. (CCH) at 1331, we said the language "$10 plus other good and valuable consideration" was sufficient

---

[37]The subject property was deeded to the county.  Because the preservation partnership was acting as the county's agent, the preservation partnership may receive the subject property on behalf of the county.

[38]In his pretrial memorandum, respondent argued that the written acknowledgment was defective because it failed to mention that a subdivision approval was part of the consideration provided to petitioners in the bargain purchase.  After trial with testimony suggesting the subdivision approval was not made for petitioners' benefit, respondent did not make this argument on brief.  We deem respondent to have waived this argument.

[*94] under section 170(f)(8)(B)(ii) but the written acknowledgment at issue there nonetheless failed section 170(f)(8)(B)(iii) because it did not include a description and good faith estimate of the "other good and valuable consideration". Distinguished from the written acknowledgment in the Schrimsher case, the August 16 letter as a whole effectively stated that the $1,550,000 cash consideration was the only consideration the county provided for the contributed property; thus no other superfluous statement would be required. See Averyt v. Commissioner, slip op. at 13-14. Moreover, the August 16 letter served the congressional intent because it definitively informed petitioners which part of the contribution was a deductible gift and which part was a taxable sale. Accordingly, we find the August 16 letter also meets the requirements under section 170(f)(8)(B)(ii) and (iii).

In sum, we conclude petitioners have substantiated the contribution of the subject property with a contemporaneous written acknowledgment that complied with the requirements of section 170(f)(8).

B.    Qualified Appraisal

Congress enacted section 170(f)(11), applicable to contributions of property made after June 3, 2004, to require a taxpayer claiming a deduction of more than $500,000 for a charitable gift of property to attach to the year's tax return a

**[\*95]** "qualified appraisal" of the property. Sec. 170(f)(11)(D). In enacting

section 170(f)(11), Congress codified the detailed requirements for a qualified

appraisal set forth in section 1.170A-13(c)(3), Income Tax Regs. (the qualified

appraisal regulation).[39] Respondent argues the 2000 appraisal was not a qualified

---

[39] Under sec. 1.170A-13(c)(3)(ii), Income Tax Regs., a qualified appraisal must include the following information:

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

(B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, * * *

(E) The name, address, and * * * the identifying number of the qualified appraiser; and if the qualified appraiser is acting in his or her capacity as * * * an employee of any person (whether an individual, corporation, or partnerships [sic]), * * * the name, address, and taxpayer identification number * * * of * * * the person who employs or engages the qualified appraiser;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience,

(continued...)

[*96] appraisal because it (1) did not value the subject property as of the contribution date; (2) was prepared four years before the contribution date; (3) did not include the date or expected date of contribution; (4) did not contain a statement that the appraisal was prepared for income tax purposes; (5) incorrectly described the subject property as having more acreage than what was actually transferred; and (6) used market value instead of fair market value as its valuation standard. While not denying the 2000 appraisal failed to meet the literal

---

[39](...continued)
education, and membership, if any, in professional appraisal associations;

    (G) A statement that the appraisal was prepared for income tax purposes;

    (H) The date (or dates) on which the property was appraised;

    (I) The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

    (J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less depreciation approach; and

    (K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

[*97] requirements in the regulations, petitioners argue the 2000 appraisal substantially complied with the requirements, citing Consol. Investors Grp. v. Commissioners, 98 T.C.M. (CCH) 601. Petitioners further argue that any noncompliance should be excused for reasonable cause.

We have previously held that an appraisal substantially complied with the qualified appraisal requirements when the appraisal was almost five months premature, did not have the contribution date, failed to include a statement that the appraisal was prepared for income tax purposes, and failed to provide the fair market value of the appraised property as of the contribution date. Id. at 614. We are doubtful the 2000 appraisal was in substantial compliance; nonetheless, we express no opinion today as to whether the cited defects in the 2000 appraisal would individually or cumulatively fail to substantially comply with the qualified appraisal regulation. See Rothman v. Commissioner, T.C. Memo. 2012-163, 103 T.C.M. (CCH) 1864, 1873-1874 (2012), vacated in part on reconsideration, T.C. Memo. 2012-218, 104 T.C.M. (CCH) 126 (2012); see also Kaufman v. Commissioner, 687 F.3d at 29; Scheidelman v. Commissioner, 682 F.3d at 197-199. Nor do we express an opinion as to whether an updated appraisal obtained at the audit stage (i.e., the 2007 appraisal) would cure the above defects as was the case in the Consol. Investors Grp. case. See Rothman v. Commissioner, 103

**[\*98]** T.C.M. (CCH) at 1873 (distinguishing <u>Rothman</u> from <u>Consol. Investors Grp.</u> in that taxpayers in <u>Rothman</u> did not provide to Commissioner required information at anytime whereas taxpayers in <u>Consol. Investors Grp</u> provided required information at audit stage). We need not decide whether the 2000 appraisal substantially complied with the requirements for a qualified appraisal because we agree with petitioners that their noncompliance would be in any event excused for reasonable cause because they reasonably and in good faith relied on Mr. LaForge's advice that the 2000 appraisal met all legal requirements to claim the deduction.

If a taxpayer donor claimed a deduction for a charitable gift of property worth more than $500,000 but failed to attach a qualified appraisal required by section 170(f)(11)(D) to his return, the deduction would not be disallowed if the taxpayer could show the failure was "due to reasonable cause and not willful neglect." Sec. 170(f)(11)(A)(ii)(II). Neither the statute nor the regulations tell us what constitutes reasonable cause in the context of a failure to obtain a qualified appraisal. However, the concept of "reasonable cause" pervades the part of the Code relating to the imposition of additions to tax and penalties for failures to comply with certain sections of the Code. <u>See, e.g.</u>, secs. 6651 (failure to file Federal income tax returns and to pay amount shown or required to be shown on

**[\*99]** tax returns), 6652 (failure to file certain information returns and registration statements), 6664(c) (accuracy-related and fraud penalties may not be imposed if reasonable cause found). So it is instructive to look at our other cases interpreting "reasonable cause".

Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the challenged item. See United States v. Boyle, 469 U.S. 241 (1985). Thus, the inquiry is inherently a fact-intensive one, and facts and circumstances must be judged on a case-by-case basis. See id.; Rothman v. Commissioner, 103 T.C.M. (CCH) at 1874. A taxpayer's reliance on the advice of a professional, such as a certified public accountant, would constitute reasonable cause and good faith if the taxpayer could prove by a preponderance of the evidence that: (1) the taxpayer reasonably believed the professional was a competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the advising professional; (3) the taxpayer actually relied in good faith on the professional's advice. See Rovakat, LLC v. Commissioner, 102 T.C.M. (CCH) at 279 (citing Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002)); see also sec. 1.6664-4(c)(1), Income Tax Regs.

**[*100]**  Mr. Crimi had relied on Mr. LaForge and Sobel as competent tax advisers for over 20 years.  Upon the filing of the returns at issue, Mr. LaForge had been a certified public accountant for over 20 years and had expertise in preparing tax returns claiming deductions for charitable contributions.  Sobel was an established regional accounting firm staffed with accountants, some of whom had law degrees.  During the 24 years of engagement, Mr. LaForge had become intimately familiar with Mr. Crimi's and Concrete's financial affairs.  The record reveals no prior history of mishaps by Mr. LaForge or Sobel.  There had also been no indication to Mr. Crimi, at least up until the instant controversy, that Mr. LaForge or Sobel had acted incompetently in his or its provision of services to Mr. Crimi and Concrete.  Thus, Mr. Crimi had no reason to doubt or second guess Mr. LaForge's or Sobel's competence, or to question Mr. LaForge's request for only a dated appraisal as inadequate.  See Estate of Lee v. Commissioner, T.C. Memo. 2009-84, 97 T.C.M. (CCH) 1435, 1438 (2009) (taxpayer may conclude on the basis of adequate due diligence that his tax adviser was competent estate tax attorney).

In seeking the advice, Mr. Crimi provided all documents to Mr. LaForge.  Mr. Crimi regularly apprised Mr. LaForge of the status of the contribution transaction.  When Mr. LaForge requested the 2000 appraisal to prepare the 2004

**[*101]** tax return, Mr. Crimi gave it to him. Indeed, Mr. Crimi gave Mr. LaForge unfettered access to all documents at Mr. Crimi's home and in Concrete's office.

On the facts and testimony in the record, we find Mr. Crimi actually relied on Mr. LaForge's advice in good faith. For over two decades, Mr. Crimi had relied on Mr. LaForge's expertise in Federal income tax for his accounting and tax planning. As far as we can tell from the record, this was the first time Mr. Crimi had engaged in a transfer of real property as a charitable gift. While Mr. Crimi is a sophisticated businessman experienced in buying and selling real estate, it was not unreasonable for him not to know the specific timeliness requirement for a qualified appraisal in the context of a charitable contribution. The record reveals Mr. Crimi's as well as Mr. LaForge's good-faith belief that an updated appraisal would not yield an appraised value much different from the one provided in the 2000 appraisal. In fact, the subsequent valuation prepared by petitioners' expert produced a number much higher than the one in the 2000 appraisal. Thus, on the facts and circumstances in these cases, it was also reasonable for Mr. Crimi to believe the 2000 appraisal was not stale in substance and thus a good appraisal. And because Mr. LaForge never raised any doubt over the 2000 appraisal to Mr. Crimi, Mr. Crimi had no reason to know or to suspect the appraisal did not meet the requirements under the regulations. On the basis of the long history of

[*102] competent professional services provided, as Mr. Crimi put it at trial, "I rely on them heavily to tell me what to do."

In sum, petitioners are entitled to a deduction for the charitable contribution of the subject property even if petitioners did not attach a qualified appraisal required under the Code and the regulations, because any failure to comply with the requirement is excused on the ground of reasonable cause.

VII.   Epilogue

In reaching our holdings, we have considered all arguments raised by the parties.  To the extent not discussed herein, we find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

An order will be issued

denying petitioners' oral motion to

shift the burden of proof, and decisions

will be entered under Rule 155.